## In re BALDWIN-UNITED CORPORATION (SINGLE PREMIUM DEFERRED ANNUITIES INSURANCE LITIGATION).

### MDL Nos. 581, M 21–35.\*

United States District Court,
S.D. New York.

May 1, 1985.

0407–CLB, 84 Civ. 1673–CLB, 84 Civ. 2233–CLB, 84 Civ. 2234–CLB, 84 Civ. 3084–CLB, 84 Civ. 6575–CLB, 84 Civ. 7297–CLB, 84 Civ. 8802–CLB and 85 Civ. 0279–CLB.

Lawrence Milberg, David Bershad, Jeffrey Bernstein, Milberg Weiss Bershad Specthrie & Lerach, New York City, for plaintiffs.

Richard E. Carlton, Melanie Cyganowski, Sullivan & Cromwell, New York City, for defendants.

William Carlisle Herbert, Hopkins & Sutter, Chicago, Ill. and Daniel J. Kornstein, Debra S. Weaver, Kornstein Veisz & Wexler, New York City, for intervenors-plaintiffs.

## MEMORANDUM AND ORDER

[Findings and Conclusions re Fairness of Proposed Settlement]

BRIEANT, District Judge.

### I. *Introduction*

Beginning in 1979, two insurance company subsidiaries of Baldwin-United Corporation began to issue single premium deferred annuities ("SPDAs"), described more particularly below. These subsidiaries were National Investors Life Insurance Company, an Arkansas insurance corporation (hereinafter "NILIC"), and University Life Insurance Company of America, an Indiana insurance corporation (hereinafter "ULIC"). During the next four years, nationwide sales of these SPDAs totalled more than Three Billion Dollars. Of the total premium amount, approximately 75% were sold through investment houses (hereinafter "the broker-dealers"), such as the defendants in eighteen separate actions ("the settling actions") now before the Court by joint motion for approval of stipulations of settlement and final judgments of dismissal. The remaining SPDAs were apparently sold by independent insurance agents.

On September 26, 1983, Baldwin-United Corporation came under the supervision of the Bankruptcy Court in the Southern District of Ohio pursuant to voluntary and involuntary petitions for reorganization filed on that date. It remains in reorganization pursuant to the Bankruptcy Code. The insurance company subsidiaries, NILIC and ULIC, were placed in the custody of state appointed rehabilitators pursuant to the laws of Arkansas and Indiana, respectively. The rehabilitators have approved rehabilitation plans, but no final order or judgment has yet been forthcoming in either of the state proceedings, each conducted by the Commissioner of Insurance of Arkansas and Indiana, respectively. Purchasers of SPDAs have filed more than 109 federal actions against the broker-dealers which marketed the SPDAs. A majority of the federal actions have been consolidated before this Court by transfer orders of the Judicial Panel on Multidistrict Litigation. *See In re Baldwin-United Corporation Litigation,* No. 581, 581 F.Supp. 739 (J.P. M.L.1984).

As is set forth in this Court's Memorandum Decision and Order, 105 F.R.D. 475, dated November 28, 1984, as amended, actions against eighteen of these defendants were certified as tentative consolidated class actions for the purpose of notifying purchasers of the terms of the proposed settlements and holding a fairness hearing. Familiarity of the reader with that decision is assumed. Notices were mailed to the 99,128 members of the plaintiff classes by December 21, 1984.[1] On February 25 and

---

1. On November 28, 1984, when the Court certified conditional classes for purposes of considering the proposed settlements and ordered that notice be mailed to class members, only four-

26, 1985 this Court conducted a full evidentiary hearing on the motion for approval of the settlement agreements. Decision was reserved. There follows this Court's findings of fact and conclusions of law with respect to the proposed settlements.

At issue in the underlying litigation is the mixed question of law and fact as to whether the SPDAs, which are the subject of this litigation, are "securities" for the purposes of establishing liability under federal securities statutes. Without reaching that question, especially in light of the pendency of other non-settling cases which may tender the issue to this Court for resolution, the Court must set forth for present purposes some neutral description of the SPDA.

The SPDAs were instruments by which the customer paid an initial lump sum in exchange for the identical promise of NILIC or ULIC to repay the initial investment together with accumulated interest, which would accrue from date of issue, but as to which income taxes would be deferred, until such time in the future as the SPDA owner might request either a lump sum payment or a series of payments for life.

As will be seen, the SPDA was ideally suited to a purchaser contemplating future retirement, following which event he or she would be paying income taxes in a lower bracket. Additional features made the SPDAs appealing: a high first-year guaranteed rate of interest was provided although the insurance companies each reserved the right to alter the interest rate during the remainder of the term of the SPDA. The SPDAs guaranteed a minimum interest rate of 7.5% for years two through ten, and 4% thereafter. As an additional significant feature, the SPDA owner was permitted to "bail out," or withdraw the amount paid, together with accumulated interest without penalty, if during the second through the sixth contract year the interest rate was reduced by the insurance company to a rate more than ¾ of 1% lower than the initial interest rate. Different SPDAs had different initial rates of interest, depending on market rates of interest at the date a plaintiff purchased his or her SPDA. Other than in this "bail out" situation, the issuing insurance companies imposed a penalty for early withdrawal. Plaintiffs' expert actuary estimates that the weighted average initial rate received by class members was 14.01%.

As mentioned above, most of these SPDAs were marketed and sold through various broker-dealers who were supplied with marketing literature and instructions by NILIC and ULIC. NILIC and ULIC appointed state licensed insurance agent employees of the broker-dealers to sell the SPDAs, and then paid a single commission to the broker-dealer upon a sale. In the typical situation, the SPDA purchaser would draw a check payable to the issuing insurance company in the total amount of the initial premium; no commissions or administrative fees were deducted from customer payments. The broker-dealers customarily received a single commission of 4% of the initial premium, paid to it by the insurance companies. In turn, the broker-dealers generally shared this commission, one-half to the registered representative whose efforts brought about the sale.

Although Baldwin-United, a diversified financial holding company developed from a piano business, was a relative newcomer to the insurance field it achieved a high volume of SPDA sales in a relatively short period of time. In part this high volume was achieved because this was the first time that annuities had been sold in large

teen broker-dealer defendants had entered into stipulations of settlement. Thereafter the Court amended its November 28, 1984 orders, by orders dated December 3, 1984, December 11, 1984 and January 16, 1985, so as to extend and apply its prior directions to four additional settling broker-dealer defendants who had filed substantially identical stipulations of settlement. As the January 16, 1985 order was not issued until after December 21, 1984, the date by which all notices were mailed to class members in seventeen of the settling actions, the Court permitted counsel to mail a supplemental notice together with the original notice to the 236 members of the eighteenth class action on or before January 21, 1985. The Court also extended the opt-out deadline for these plaintiffs until February 15, 1985.

quantities by member firms, which generally have access to a pool of funds not readily available to the insurance industry. Also the instruments filled a perceived need on the part of customers seeking to defer taxes and assure a high rate of return by acquiring an instrument regarded as safe because issued by a state licensed insurance company, theoretically at least, under the regulation and supervision of the insurance commissioners of Arkansas and Indiana, as well as 47 other states, excluding only New York, which had approved these companies, and authorized them to do business therein. The high sales volume may also be attributable to the aggressive sales tactics of the issuing companies and the broker-dealers, who allegedly recommended the SPDAs as very safe, high-yield investments, suitable for sale to customers planning their retirement income. For example, one brochure distributed by a defendant described the SPDAs as "a tax shelter that's as safe as a savings account." As noted above, these opinions derived at least in part from the status of NILIC and ULIC as statutory reserve life insurance companies presumably subject to close regulation by state insurance officials. In each state where one or both of these companies sold SPDAs, local regulatory and licensing officials engaged in examination of the financial condition of NILIC and/or ULIC as a prerequisite to such sales. A.M. Best & Co., the leading insurance company rating agency, rated both insurance companies "A" or "Excellent" for 1980, 1981 and 1982.

Neither Baldwin-United, nor NILIC or ULIC are parties to the large majority of these actions.[2] It appears from allegations and statements of counsel for plaintiffs and defendants that the parent corporation, Baldwin-United, engaged in a series of corporate acquisitions of doubtful value. In so doing, it jeopardized its own solvency, and it had "upstreamed" 20% of the reserves of the insurance subsidiaries by investing the funds of NILIC and ULIC in

Baldwin-United paper, or paper of other affiliates or subsidiaries. Apparently Baldwin-United's 1981 purchase of MGIC Investment Corporation, reportedly financed with the insurance companies' reserves, was the principal cause of the parent's having to borrow more than it could repay. Apparently also while collecting millions of dollars in proceeds of annuities, NILIC and ULIC deviated from the traditional practices associated with the investment of reserves for future payouts in annuities by investing in equities, rather than in fixed income obligations. Thereby it placed at greater risk the reserves protecting the amounts to be paid in the future to SPDA purchasers. Plaintiffs also assert that Baldwin-United engaged in an improvident "tax arbitrage" strategy which sought to utilize the tax losses of the insurance companies to offset the anticipated profits of other subsidiaries which were not engaged in the SPDA business.

Central to the majority of plaintiffs' claims in the eighteen settling actions is the assertion that broker-dealers knew or should have known that because of these improvident financial manipulations within Baldwin-United, NILIC and ULIC, the SPDAs were a high-risk investment, not the "guaranteed safe" investment allegedly promised to most SPDA purchasers.

## II. *Legal Theories*

The class plaintiffs have filed nearly identical consolidated complaints against each of the eighteen broker-dealer defendants in the settling actions and against defendant Planco, Inc., a Pennsylvania corporation alleged to have become an aider and abetter by having provided consulting services to NILIC and ULIC and having distributed promotional literature on the SPDAs. The complaints assert a variety of federal claims for relief as well as pendent state common law and statutory claims. The federal claims, for the most part, center on the allegation that the SPDAs are

**2.** Although the majority of the federal complaints name only broker-dealer defendants, ULIC is a defendant in four actions, NILIC is a

defendant in one action, and Baldwin-United is a named defendant in two actions.

securities subject to the registration requirements of the Securities Act of 1933, and subject to the disclosure obligations of both the 1933 Act and the Securities Exchange Act of 1934, including Rule 10b–5 promulgated thereunder. Liability is predicated upon 15 U.S.C. §§ 77e, 77l(1) and 77l(2), 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5. There is also a federal claim under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1960, *et seq.*, against all broker-dealer defendants but one.

Plaintiffs contend that defendants failed to file a registration statement, that they used writings in the nature of a prospectus which included untrue statements and omitted material facts, that they made false and misleading statements, and used deceptive practices, all in connection with the sale or offer for sale of the SPDAs, and did so using interstate means.

Plaintiffs' contention that the SPDAs are securities is an allegation concerning a mixed issue of fact and law, which this Court finds non-frivolous, and therefore sufficient to vest subject matter jurisdiction in this Court, and indeed, exclusive subject matter jurisdiction to the extent that the claims are founded on the 1934 Act. See *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); 15 U.S.C. § 78aa. Essentially, plaintiffs assert that the SPDAs were sold by firms which are engaged primarily in the securities industry, and that there were conversion and bail-out options said to be more characteristic of securities than insurance. Plaintiffs argue that there was no substantial mortality risk as a practical matter. Defendants in turn insist that the SPDAs are not securities and were not sold as such, and that plaintiffs would not at trial be able to establish liability either under the federal securities acts, or comparable state laws which regulate the sale of securities. Assuming *arguendo* that an SPDA is a security, plaintiffs hope to prove at trial that defendants each knew or should have known of the financial deterioration within the Baldwin-United empire and its subsidiaries, and nevertheless continued to present the SPDAs to customers as risk free.

In addition to federal claims, the eighteen complaints plead pendent state claims including common law fraud, common law negligence and breach of fiduciary duty, breach of contract, and violations of state licensing and regulatory statutes including so-called consumer protection statutes of the various states. The degree or extent of proof required under the different statutory and common law bases for liability is a disputed issue, discussed below in this Court's evaluation of the merits of the proposed settlements.

### III. *Rehabilitation*

On July 13, 1983, both NILIC and ULIC, together with four affiliated companies which had reinsured the SPDAs in part, were placed in rehabilitation by official action of the insurance commissioners of Arkansas and Indiana. The respective state courts issued interim orders of rehabilitation and appointed the two insurance commissioners as Rehabilitators, instructed to assume control of the assets and business of the six insurance companies. Among the causes necessitating rehabilitation was the fact that the insurance companies held securities of Baldwin-United and its affiliates which were of uncertain value due to Baldwin-United's financial difficulties. On September 26, 1983, as noted earlier, Baldwin-United and its non-insurance affiliates came under the protection of the Bankruptcy Court.

Following state court hearings in January, 1984, and extensive cooperative efforts among the court-appointed Rehabilitators and various insurance officials of other states, a Rehabilitation Plan ("the Plan") was developed for submission to the Arkansas and Indiana courts. These courts approved the Plan and it became effective on May 1, 1984. Under its terms SPDA purchasers will receive 100% of their principal and 100% of all credited interest up to the date of rehabilitation. SPDA owners generally are credited with their guaranteed first-year rate of interest, even if the

SPDA was still in its first contract year on the date rehabilitation began. Then, beginning on the later date of rehabilitation (July 13, 1983), or expiration of the first year, and until May 1, 1984, SPDA owners are to receive a 9.5% per annum interest rate. After May 1, 1984 and until the completion of the Rehabilitation Plan on November 1, 1987, they are to receive an "assured rate" of 5.5%. The significance and extent of this "assurance" is discussed below.

During the first year of the rehabilitation proceedings, SPDAs lost their liquidity, since the NILIC and ULIC assets were frozen. Accordingly the "bail out" window was closed, as was the right to withdraw even with a penalty. However, beginning in June 1984, SPDA holders have been able to elect from six options under the Plan, thereby obtaining access to their funds; an SPDA holder can, for example, take a non-recourse loan for up to 75% of the May 1, 1984 accumulated value of his SPDA or withdraw 10% of the value of his SPDA each year. As may be seen, in addition to this limited deprivation of the right to obtain liquid funds, the effect of the Rehabilitation Plan is to reduce earnings on the SPDAs to rates below the generally prevailing market rates, which the owner presumably would have earned had he "bailed out" and reinvested his funds in the event of a decrease in rates paid by NILIC and ULIC. Also, after May 1, 1984, the rate of interest fixed by the Plan (5.5%) is 2% less than the guaranteed minimum rate of 7.5% per annum provided on the face of the SPDAs.

The various claims for relief in the class complaints leave room for argument concerning the possible extent or amount of damages recoverable from the broker-dealers. Assuming that the Rehabilitation Plan succeeds, a point discussed below, the absolutely essential loss of the class members henceforth, and after May 1, 1984, will be the 2% difference between the 7.5% minimum contract rate of interest, which the SPDAs carried, and the 5.5% "assured" rate under the Rehabilitation Plan. The Court believes that plaintiffs' liason counsel has thoroughly examined all damage theories, and is probably correct in estimating class damages at a figure representing the difference between the value of amounts to be received under the Rehabilitation Plan and the value plaintiffs would have obtained by investing in identical SPDAs issued by a company which did not require a Rehabilitation Plan.

Under a realistic "benefit of the bargain" damages analysis, a SPDA owner might attempt to prove that he lost interest he was due to earn at a rate greater than the 7.5% guaranteed minimum rate and less than the high first-year rate (actuarily estimated at an average of approximately 14%). This latter theory is difficult, however, because no one knows how many SPDA holders would have bailed out in the event of a decrease in the interest rate paid by NILIC and ULIC, not connected with Rehabilitation. We do know that the SPDA owner had a disincentive to bail out, since proably he would have incurred tax liability unless he reinvested in another tax deferred annuity, and probably he would have confronted stiffer withdrawal penalties in a new SPDA. Therefore it is likely that the most a SPDA owner would have earned under his "bargain" was whatever interest rate prevailed in the market for comparable investment instruments during the relevant period. A major SPDA writer was crediting a 10.25% rate on new SPDAs during the second half of 1983, the period in which most of Baldwin-United's policy renewal windows were concentrated. As demonstrated by the Tables attached to Exhibit B to the Affidavit of David J. Bershad, sworn to February 25, 1985, average market rates have fluctuated between 13.47% and 10.75% for the period from January 1983 to date.

The Court cannot accept the argument by the Maine Attorney General that the amount of damages sustained by the class should be measured by the bail-out rate applicable to the particular SPDA. It is unrealistic to expect that Baldwin-United would have continued to establish future rates for outstanding SPDAs at a rate

higher than market rates on similar investments or even that the SPDA holder who desired a tax deferred retirement income would have bailed out immediately and been able to reinvest at a higher than market rate. Under Maine's theory, the broker-dealers would be liable for the highest first-year rate less ¾ of 1%—the bail out level—for the entire period following Rehabilitation. This cannot be a reasonable prediction of what plaintiffs could recover if they proceeded to trial and established liability against the broker-dealers under a statute or common law precedent permitting benefit of bargain damages.

Under a rescission damages analysis, it also is difficult to predict the possible recovery available to class members. Plaintiffs' liason counsel has analyzed this issue and has provided the Court with graphs illustrating the proceeds which would go to a SPDA holder whose policy was rescinded and who received pre-judgment interest at the statutory rate effective in various states. It is noteworthy that the figures presently before the Court demonstrate that a rescission theory of damages would probably provide a lower total recovery, for most class members, than would the combination of the Rehabilitation Plan and this proposed settlement.

In summary, then, plaintiffs may or may not be able to prove some measure of damages based on a claim that they were due interest at a rate higher than the face guaranty of 7.5%. Undoubtedly any proof they may advance will be opposed by the broker-dealers who would argue, among other things, (1) that retention of the SPDAs precludes a damage remedy for violations of the 1933 Act, *Wigand v. Flo-Tek, Inc.,* 609 F.2d 1028, 1035 (2d Cir.1979); (2) that a rescissionary measure of damages yields a negative sum; (3) that the "bargain" contracted for was no more than 7.5% interest for years two through ten; and (4) that if any damages exist, they were not caused by the broker-dealers.

Without making any finding as to the damages issue, and whether plaintiffs could succeed even in presenting a *prima*

*facie* case against the settling defendants, the Court is persuaded to consider the limited loss of liquidity suffered by class members, together with the 2% gap between the assured rate and the SPDA guaranteed rate, as a minimum or floor in determining the face value of the class members claims against the settling broker-dealers, assuming plaintiffs prevail.

### IV. *The Proposed Settlements*

Against the possible damages which could be recovered, the settling defendants have agreed to an overall plan which will terminate all the actions and release all the claims of the participating class members. All of the SPDAs marketed by the settling defendants are treated equally, without regard to the date on which sold, or whether sold by NILIC or ULIC. Furthermore, it is of no significance in the settlement which of the settling defendants served as the agent in connection with the sale. The approximate dollar contribution of each of the various broker-dealer defendants is as follows:

| | |
|---|---:|
| Advest, Inc. | $ 528,801.00 |
| A.G. Edwards & Sons, Inc. | 11,935,000.00 |
| Bateman Eichler, Hill Richards, Inc. | 430,879.00 |
| Blunt Ellis & Loewi, Inc. | 4,374,984.00 |
| Boenning & Scattergood, Inc. | 37,539.00 |
| Drexel Burnham Lambert Incorporated | 1,293,899.00 |
| E.F. Hutton Group, Inc. | 33,982,765.00 |
| Herzfeld & Stern | 55,321.00 |
| Janney Montgomery Scott Inc. | 1,375,000.00 |
| Kidder, Peabody & Co., Inc. | 7,116,433.00 |
| Merrill Lynch & Co., Inc. | 44,203,500.00 |
| Moseley Hallgarten Estabrook & Weeden, Inc. | 1,347,500.00 |
| Oppenheimer & Co., Inc. | 685,245.00 |
| Parker/Hunter, Inc. | 29,909.00 |
| Prudential-Bache Securities Inc. | 18,590,000.00 |
| Smith Barney Harris Upham, Inc. | 9,548,806.00 |
| Thomson McKinnon Securities, Inc. | 4,075,500.00 |
| Tucker Anthony & R.L. Day, Inc. | 472,312.00 |

In addition to these contributions by the settling broker-dealers, Planco, Inc., an insurance consulting firm named as a defendant in all eighteen settling actions, has agreed to contribute an aggregate of $232,-

940.00 in cash and to assign $871,200.00 of its claims in the Rehabilitation proceedings, claims for unpaid commissions or compensation owed to Planco by certain of the companies undergoing Rehabilitation. The settlement fund is now bearing interest and has been as of February 1, 1985.

The settlement fund totals approximately 140 Million Dollars. The settling parties calculated contributions to the fund by charging each of the eighteen brokers at the rate of 5.5% of the aggregate accumulated value as of May 1, 1984 of all SPDAs sold through that broker. Thus a broker which produced a higher dollar value of SPDAs will pay more than another broker which sold less; but each class member obtains the same proportionate recovery based on the May 1, 1984 accumulated value of his or her SPDA, a value already determined for each class member by the court-appointed Rehabilitators. It is estimated by plaintiffs' liason counsel that this settlement fund, which represents a cash payment wholly apart from what the class will recover under the Rehabilitation Plan, equals approximately 27% of a plaintiff's damages, that is, 27% of the shortfall in interest during the Rehabilitation period. As discussed above, plaintiffs' counsel estimates that the "assured rate" (5.5%) is nearly six percent less than the probable open market rate of return that would be available but for the Rehabilitation proceeding. Of this six percent loss, the settlement fund is to yield an additional return near 1.8% per annum, reducing the shortfall in yearly earnings from 6% to 4.2%. The ultimate value of the settlement fund depends upon how the settlement fund is invested and the overall performance of the financial marketplace. However, if plaintiffs' damages are measured at the SPDA face guaranty of a 7.5% minimum rate of interest, then the broker-dealer contribution of 1.8% together with the 5.5% assured rate makes up 7.3% which comes close to a 100% recovery for SPDA holders.

Upon approval of the Court, the 140 Million Dollars in settlement proceeds will be utilized in one of two ways. It could be directed to fund in part an overall or "Global Enhancement Plan" by which an unrelated insurance company would assume the obligations for payments pursuant to the Rehabilitation Plan. In the alternative, the settlement proceeds and all interest accrued thereon would be distributed in lump sum cash payments to class members in proportion to their accumulated values as of the May 1, 1984 date. Attorneys fees and expenses will be deducted before the settlement proceeds are distributed to class members or contributed to a Global Enhancement Plan.

In evaluating the potential recovery available to the plaintiff classes, the Court must also consider the role of state insurance "guaranty" associations, six of which have intervened as party plaintiffs and objected to the proposed settlements. Approximately 33 states have these guaranty associations, or the equivalent, which function in a manner similar to the Federal Deposit Insurance Company. Funded by levies generally raised from insurance companies on total premiums written, these associations, membership in which is usually compulsory, make up the difference in value between that which is received in the rehabilitation of an insolvent or failing insurance company, and the amount due the insured for the value of the insurance policies or annuities prior to rehabilitation. In 33 of the states where NILIC and ULIC did business, the class members are protected by the additional sums to be due from the guaranty associations. However, the statutory liability of the guaranty associations does not inhere until a "final" plan of rehabilitation has been adopted with respect to NILIC and ULIC; only thus could the value of what is received be compared with the value of the insurance purchased, in order to compute the amounts of damage or loss due from the guaranty association. The Commissioners in their Rehabilitations Plans have not made a final order, and the nature of their Plan is such that no final amount could yet be determined. Such a determination may take years in light of the upstreamed "investments" of the insurance companies in Baldwin-United affil-

iates, the true value of which may depend on the outcome of the Baldwin-United bankruptcy.

Under the terms of the stipulations, conclusion of this settlement may tend to release the guaranty associations from liability to those who accept settlement, and it is arguably true that even in those cases which might go to trial and prevail on the merits, the net recovery of a plaintiff from a broker-dealer ·must be credited to amounts which may come due from the guaranty association. As far as the Court can tell, some of the state associations mean to disclaim liability, or at least to postpone a determination of their liability until 1987 when the Rehabilitation Plan is concluded. Other states' funds have notified SPDA holders in their states that the guaranty fund will insure a full recovery. (*See* Defendant's Ex. C–3 and G–46).

The applicable standards by which a class action settlement is judged have been set forth clearly in the case law of this Circuit. A settlement proposal must be "fair, adequate and reasonable," *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982), *cert. denied*, — U.S. —, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983), upon a comparison of "the terms of the compromise with the likely rewards of litigation." *Id.* at 73 (quoting *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968). The role of the court is to reach an objective, educated estimate of the complexity and probable success of full litigation, together with all other factors relevant to a fair evaluation of the wisdom of the proposed compromise. *Kaye v. Fast Food Operators, Inc.*, 99 F.R.D. 161, 163 (S.D.N.Y.1983). As was stated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974), the relevant factors include:

"(1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement ...; (3) the stage of the proceedings and the amount of discovery completed ...;

(4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment ...; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation ...." (Citations omitted).

In weighing such factors, the trial court has neither the right nor the duty "to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute." *Grinnell, supra*, at 456. Furthermore, because of the strong policy in favor of settlements, the evidence heard by the court must be weighed according to a burden of proof which shifts to the objecting class members once the proponents have met their initial burden of proving "that the settlement was reached as a result of arm's length negotiations, that the proponents are represented by counsel experienced in similar cases, that there has been sufficient discovery to enable counsel to act intelligently, and that the number of objectants or the relative size of their interests is, small." *In·re Shopping Carts Antitrust Litigation*, MDL No. 451, 1984–1 Trade Cas. (CCH) § 65,823 (S.D.N.Y.1983); *Desimone v. Industrial Bio-Test Laboratories, Inc.*, 83 F.R.D. 615, 618 (S.D.N.Y. 1979). Mindful of these standards, we now consider the propriety of the proposed settlements in light of the relative strengths and weaknesses of plaintiffs' case.

It can hardly be disputed that a settlement in these eighteen actions would obviate the need for extensive motion practice, months of depositions and other lengthy pre-trial procedures. If the settlements are not approved, it is most likely that the present actions will become more complicated by the addition of state regulators and guaranty associations as third-party defendants. It has been demonstrated by the progress of the non-settling actions that the defendant broker-dealers would

file third-party complaints against these state officials, Baldwin-United, and against NILIC and ULIC. *See e.g. Lane v. E.F. Hutton & Company, Inc., et al.,* CV 84–000018 (Mobile Co. Alabama); *Erti v. Paine Webber Jackson & Curtis, Inc., et al.,* (S.D.N.Y., 83 Civ. 9085–CLB).

In addition, multiple appeals are inevitable because of the lack of certain appellate authority on many of the critical legal issues which will determine the outcome of plaintiffs' case. If NILIC and ULIC are forced to defend in these lengthy proceedings the cost will be borne by SPDA holders whose funds are in the hands of the Rehabilitators of NILIC and ULIC. Finally, the risk of appeal is not confined merely to expense and delay; an adverse ruling upon appeal could overturn whatever recovery plaintiffs might obtain at trial. *See e.g., Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (reversing multimillion dollar judgment after lengthy trial); *Trans World Airlines, Inc. v. Hughes,* 312 F.Supp. 478 (S.D.N.Y.1970), *aff'd,* 449 F.2d 51 (2d Cir.1971), *rev'd,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (overturning $145 Million Dollar judgment after years of appeals).

As to the second factor listed in *Grinnell, supra,* the reaction of the class members has demonstrated little or no opposition to the settlement proposal. Although a total of 99,128 notices were mailed to individual SPDA holders in 50 states, only 323 policyholders requested exclusion from the settlement classes. This is approximately ³⁄₁₀th of one percent of the total number of SPDA holders. The number of "opt-outs" appears to be more or less randomly distributed, with Alabama having the largest number at 53. In 16 states no SPDA holders chose to opt out; in another 21 states, five or fewer SPDA holders requested exclusion. Objections, many in the form of short, handwritten letters, were received from approximately 48 SPDA holders. Thus the settlement class members, whose interests are at stake, have expressed a minuscule amount of opposi-

tion to the proposed compromise of their claims against the broker-dealer defendants. The Court does not perceive this response as a ratification of the settlements. However, any plaintiff who believed that he could recover a larger sum by continuing to press his case should be expected to have opted out and proceeded individually or by motion for certification of an ordinary plaintiffs' class.

The third factor listed in *Grinnell* concerns the stage of the proceedings and the adequacy of information available to counsel who seek court approval of the settlement agreements. In this case, counsel have demonstrated that they had access to extensive documentation concerning the financial condition of the Baldwin-United companies and the facts or absence of facts sufficient to provide notice to these defendants of any danger associated with SPDAs issued by NILIC and ULIC. The documents were either produced by the settling defendants, or were available from the state Rehabilitation proceedings and the Ohio bankruptcy court. Plaintiffs' counsel examined these documents, and interviewed key personnel of the settling defendants, in their efforts to discover the process by which the broker-dealers marketed the SPDAs, and the manner in which broker-dealers sought to satisfy themselves with regard to the financial solvency of NILIC and ULIC. Documents examined by plaintiffs' counsel included the SPDA promotional literature, memoranda by nonparty investigators of Baldwin-United and its insurance subsidiaries, and internal memoranda of the settling defendants relating to the extent of defendants' contemporaneous knowledge concerning the "upstream" investments of the insurance companies' assets into the parent corporation as well as defendants' general prospective knowledge of the financial conditions in the Baldwin empire. According to the affidavit of Lawrence Milberg, sworn to February 21, 1985, plaintiffs received and reviewed virtually all of the exhibits to which the objectors refer that relate to the settling defendants' potential liability.

Based upon this factual investigation, plaintiffs' counsel conclude that the claims asserted in the class action complaints have substantial merit, but that the complexities and uncertainties of this litigation warrant the approval of the proposed settlements. Plaintiffs have argued vigorously that the defendants had no reasonable basis to believe in the truth of the representations allegedly made to class members regarding the safety and high yield of the SPDAs at the time they were sold to plaintiffs. However, the defendants have countered with factual and legal arguments which cast serious doubt on the probable success of plaintiffs' theory that defendants made material misstatements or omissions. In response to the argument that defendants could not have represented truthfully that the SPDAs were "risk free" investments, defendants argue that, as a matter of law, the broker-dealers were entitled to rely upon the state regulatory system and the imprimatur of financial soundness which accompanies licensure in 49 states. *See Cotten v. Republic National Bank of Dallas,* 395 S.W.2d 930, 945 (Tex.Civ.App.1965) ("the Bank was entitled to believe, in the absence of evidence to the contrary, that the Board of Insurance Commissioners had made the necessary examinations of [the insurance company] and had been satisfied by its annual statements that it was solvent"). As a matter of fact, defendants point to numerous industry reports, such as the expert opinions rendered by Milliman & Robertson, all to the effect that the SPDAs were salesworthy right up until the eve of Rehabilitation. Many of these reports have been supplied to the Court as exhibits. For example, in a report dated April 15, 1983, Milliman & Robertson advised the broker-dealers by whom it had been retained that there was no reason to advise customers to redeem the SPDAs which they had already purchased. (Defendants' Ex. F–22). Defendants also point to the fact that the state insurance officials repeatedly provided reassurances during the months immediately preceding Rehabilitation. In a letter dated June 9, 1983, one month before Rehabilitation, the Indiana Insurance Commissioner wrote a letter to each SPDA holder, stating in pertinent part:

"Minimum capital and surplus requirements provide that an insurer will not be allowed to do business unless it is adequately capitalized and has sufficient available surplus funds. For the SPDAs, the Insurer must show a reserve liability of 100% of the principal and interest credited to the policyholder so that the financial statements accurately reflect the company's financial condition at any given point in time. * * * As of December, 1982, the Baldwin-United insurance companies reported combined assets of over $4.5 billion. More that $229 million above the reserves of $65 million which are required by law, were held in surplus."

These examples and many others provide a basis on which defendants contend that at least for all of 1979, 1980, 1981, and 1982, there was no reason to doubt that SPDA holders were fully protected. This evidence, at the very least, provides a colorable defense to Counts III and IV of the complaints, and plaintiffs' counsel has recognized that plaintiffs bear a risk of establishing that defendants knew that their representations were materially false and misleading or that they acted with reckless disregard as to whether they were true.

Before plaintiffs can even advance proof that defendants' conduct was misleading under the federal securities statutes, plaintiffs bear a burden of establishing that the SPDAs are subject to federal securities regulation. A finding that the SPDAs are not "securities" would compel dismissal of Counts I, II and III of the complaints, as well as the dismissal of comparable state blue sky claims and the federal RICO count which is predicated upon alleged securities law violations. The issue is one of first impression subject to appellate review, although perhaps not until entry of a final judgment if decided favorably to plaintiffs. Furthermore, even if the Court were to find that the SPDAs are securities, defendants contend that they were exempt from

registration under Sections 3 and 4 of the 1933 Act.

Without passing on the merits of the securities claims, it must be noted that under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–12, the "business of insurance" is, by statute, solely a matter of state regulation. In its rulemaking power, the Securities Exchange Commission ("SEC") issued a proposed rule in 1978 which would have found guaranteed investment contracts sold by insurance companies to be "securities" subject to SEC authority instead of state insurance commissions. The proposed rule provoked negative comment and was withdrawn on April 5, 1979, accompanied by a policy statement in place of legislative rule. Securities Act Release No. 6051, 44 Federal Register 21626. The SEC statement of policy emphasized that "the central feature of a life insurance or annuity contract is the assumption of various risks by the insurance company ..." and that an assumption of both mortality risks and investment risks is required, in the SEC's view, for a contract to be exempt under § 3(a)8 of the 1933 Act. Defendants argue that the NILIC and ULIC SPDAs were issued after this pronouncement and that they comply with the SEC's guidelines for insurance, not securities. Therefore defendants contend that the SPDAs were not required to be registered, and the broker-dealer defendants cannot be liable under § 12(1) of the 1933 Act. *See* L. Loss, *Fundamentals of Securities Regulation* 1018 (1983).

Moreover, defendants have raised a statute of limitations defense to any claim under § 12(1). The three year limitations period found in § 13 is said to have commenced in 1979, the date the SPDAs were first licensed and approved for sale. None of the settling actions was filed prior to September 1983.

Regardless of the existence of federal securities laws and their disputed applicability to the within actions, the objectors contend that the parties who are proponents of the settlement have underestimated the strength of plaintiffs' state law claims that the broker-dealers committed fraud or violated state statutes relating to consumer protection. As to a claim of common law fraud, the proof of *scienter* on the part of the defendant presents at least the same problem existing in proof of a Rule 10b–5 violation, except that the concepts of a misleading omission or a reckless, but non-fraudulent disregard on the part of the person making the misrepresentation are not nearly so well developed in the context of pendent state law fraud as they are in the jurisprudence arising under the federal securities laws. *Compare, Restatement (2d)* of Torts §§ 525, 526 with *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

The various state consumer protection statutes might provide a more advantageous theory of relief for SPDA holders; however, they are not uniform throughout the fifty states on such issues as intent, knowledge, limitations periods, availability of punitive damages, or even the kinds of sales or the sort of product/service covered.

Recognizing that it is difficult for the Court to evaluate the strength or weakness of statutory consumer protection claims where numerous states have differing statutes, the Maine *amicus* brief analogizes to the jurisprudence that has developed under the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, claiming that "almost thirty States explicitly direct their state courts to consider or give weight to [such jurisprudence]." Under this analogy, and attempting the most basic distillation of the differing laws of the various states, it may be concluded that these consumer protection laws essentially require proof that the defendants' conduct was "unfair or deceptive." It is not necessary generally to show that a consumer was actually deceived, only that the defendant made statements in commerce that have a substantial tendency to deceive. *See e.g. Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir.1979); *Haner v. Quincy Farm Chemicals, Inc.*, 97 Wash.2d 753, 759, 649 P.2d 828, 831 (1982). The

objectors argue that all or nearly all of the positive statements promoting SPDA sales had a tendency to deceive. However, this implicates the problem of demonstrating some absence of good faith or that the broker-dealers should have known or suspected that the SPDAs might be in jeopardy at the time of the sales. According to the objectors, there was *no basis* for the positive representations made to consumers. (Memorandum of *Amici* States at 31–32).

Even if such a theory does not require any proof of reliance by consumers, or causation, and even if it does not require any proof of intent to deceive, it nevertheless depends upon proof that the defendants had access to facts sufficient to alert them that the promotional literature or other statements would tend to deceive, and that the *factual basis* upon which broker-dealers reached the conclusion to recommend the SPDAs was untrustworthy. The Federal Trade Commission itself defines deception as a statement contrary to fact or an omission of information necessary to prevent misleading. FTC Policy Statement on Deception, Antitrust & Trade Reg.Rep. (BNA) No. 45 at 689 (October 14, 1983). Furthermore, the objectors' theory does not confront the point that the broker-dealers had a right to rely upon official state regulators who were obligated to safeguard solvency of the insurance companies and who uttered comforting bromides almost to the end. The settling defendants observe that under the interpretation advanced by objectors, insurance agents would become themselves guarantors of the entire insurance industry, leaving state regulators and statutory guaranty funds with no function to fulfill.

There is nothing in human affairs which can be made by statute as risk free as the objectors say the consumer protection statutes have made the purchasers of SPDAs. Experience already has shown that litigation under such state statutes is far from a sure thing as now argued. One state action by a SPDA holder based on negligence, tortious misrepresentation, breach of contract and fraud, and violation of a state statute concerning annuity sales has been tried. The jury returned a verdict for the defendant broker-dealer in that case, which is also a non-settling defendant in MDL–581. *Carter v. Parham and J.C. Bradford & Co.*, Civil Action No. 83–52–21881 (Sullivan Co. Tennessee). In another such state action where a state-wide class was certified, and where plaintiffs alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, *Russo v. Merrill Lynch Pierce Fenner and Smith, Inc.*, No. 83 L 52748 (Cook Co. Illinois), the plaintiffs' attorneys actively participated in the instant litigation in this Court with Plaintiffs' Steering Committee in settlement negotiations with the defendants, thus ensuring that state law claims were used as leverage in obtaining the best possible settlements, and suggesting a belief on their part that the federal claims are no less viable than the state claims. Had they believed otherwise, presumably their clients would have opted-out, as did a large group of plaintiffs pursuing state court actions in Alabama.

Three of the objecting Attorneys General are from states where experienced attorneys who were prosecuting state court class actions eventually decided after investigation that the interests of their clients would be better served by representation in these nationwide federal class actions. In addition, counsel for a statewide class in California, who previously objected to the motion for conditional certification of a national class, has since decided to support the settlements. (Affidavit of James Sturdevant, Esq., sworn to March 12, 1985). Finally, 155 named plaintiffs in 66 federal and state actions have either signed the stipulations of settlement or filed certificates of concurrence.

The plaintiffs resident in such states and their intelligent and aggressive profit minded lawyers have in effect voted with their feet. In large numbers they have had recourse to a federal securities class action in preference to a state consumer action. In large numbers they have failed to opt out

of the settlement class. Are they all wrong?

This Court is not persuaded that the litigation value of the claims under state consumer protection statutes so outweighs the value of the substantive provisions contained in these proposed settlements as to justify rejection of the settlements. First, the consumers in each state would have problems of proof peculiar to the laws of that state. Second, even consumers in a single state probably could not expect to achieve similar results of litigation because the SPDA sales occurred at varying dates, at times when different amounts of information concerning Baldwin-United's financial condition were available to the broker-dealers. Indeed many of the SPDAs were sold when Baldwin-United was both solvent and prudently operated. The practical realities of the situation would prevent a nationwide resolution which is a desirable feature of the settlement proposals, and would lead to different fortuitous and inconsistent results dependent on the date and place of sale. A few might be enriched slightly, but many would take nothing.

The suggestion made by some objectors that the Court should sever state claims, or create subclasses which would be permitted to pursue their state claims following an approval of the settlement agreements presents an illusion. It is no solution at all to propose severence of the state law claims since the stipulations of settlement are voluntary, and performance is expressly conditioned on dismissal of *all* claims. Any material modification of the agreements of the settling parties which might be imposed by the Court undoubtedly would cause the whole settlement to dissolve. Not only is the dismissal of all of plaintiffs' pendent and federal claims a term in the stipulations among the settling parties, but the Court is authorized to approve releases of all of the state and federal claims if it determines that the settlements on the totality of the facts are fair, adequate and reasonable. As stated in *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 221 (5th Cir.1981),

*cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982),

"The weight of authority establishes that ... a court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter of fact set forth or referred to in' the complaint. *Patterson v. Stovall,* 528 F.2d 108, 110 n. 2 (7th Cir.1976). See also *McDonald v. Chicago Milwaukee Corp.,* 565 F.2d 416, 435 (7th Cir.1977). And it has been held that even when the court does not have power to adjudicate a claim, it may still 'approve release of that claim as a condition of settlement of [an] action [before it]'." [Citations omitted].

In addition to evaluating the substantive terms of the proposed settlements as compared to the likely rewards of litigation, a district court should pay attention to the process by which the settlement was reached. *Weinberger,* 698 F.2d at 74. The reason for focusing on the negotiating process is that a court cannot, in effect, conduct a trial in order to determine whether there should be a trial, and the necessarily limited examination of the merits should be supplemented by an inquiry into the thoroughness of representation by counsel. The Court is satisfied that the attorneys representing the plaintiff classes thoroughly analyzed all available legal theories, including those discussed above, and entered into the settlement agreements following arms-length negotiations with defendants' counsel. As is amply demonstrated by the Affidavit of Richard E. Carlton, sworn to February 21, 1985, the within settlement proposals developed out of intense discussion which took place among various parties, their counsel and plaintiffs' counsel over a six-month period. The initial settlement figure which defense counsel agreed to recommend to their clients was an all-cash settlement equal to 4% of the accumulated value of the policies sold by each broker—a figure substantially lower than the 5.5% now contained in the stipulations of settlement. Even at the 4% level, many broker-dealers apparently believed that the

sum offered was too high. Eight broker-dealers who are defendants in companion federal class action complaints have continued to reject the proposed settlements and litigate. Plaintiffs rejected the 4% proposal, more discussion followed, and plaintiffs eventually prevailed in their demand for the higher 5.5% figure. According to the Carlton affidavit, "the only concession made by plaintiffs' counsel was their agreement that interest on the settlement fund would not commence to run until February 1, 1985, which was also [then] the cutoff date by which an enhancement plan would have to be in place." The settling defendants believe that the settlement terms are more expensive than initially contemplated and that their acceptance of the terms is made with the objective of aiding customers of the brokerage houses and maintaining good will, rather than merely as a result of evaluating the merits of the claims or the risk of the litigation.

This Court has conducted frequent case management hearings and meetings of counsel in connection with this multidistrict litigation and has had the opportunity to observe the ability of counsel for all parties. They have proved to be experienced, professional attorneys whose judgment is entitled to some weight. *Weinberger,* 698 F.2d at 74; *West Virginia v. Charles Pfizer & Co.,* 314 F.Supp. 710, 741 (S.D.N.Y. 1970) *aff'd,* 440 F.2d 1079, *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971); *Stull v. Baker,* 410 F.Supp. 1326, 1332 (S.D.N.Y.1976). There has been no hint of collusion or abuse, and, as noted in this Court's Memorandum Decision and Order dated November 28, 1984, the appointment of liason counsel and a plaintiffs' steering committee has ensured the fact that plaintiffs spoke consistently with one voice throughout the settlement negotiations.

Turning to the sixth *Grinnell* factor applicable to a determination of the fairness of a settlement proposal, "the risks of maintaining the class action through trial," this issue also presents an obstacle to plaintiffs' chance of obtaining a speedy trial and any consolidated resolution of the individual claims, numbering potentially in the thousands. Although the Court has certified conditional settlement classes, the Court has not ruled on the motions for class certification outside the context of the within proceedings on the fairness of the settlement proposal. Plaintiffs anticipate that defendants would contest vigorously any effort to certify ordinary classes pursuant to Rule 23, F.R.Civ.P., and the defendants' brief states that: "If the settlements are not approved, class certification is highly unlikely." The major obstacle to regular class certification perceived by defendants is the disputed ability of the moving plaintiffs to establish a predominate "common question." The common question asserted in the complaints is whether the SPDAs are securities and whether defendants violated the federal securities laws by participating in the sale of the unregistered SPDAs, disseminating misleading information, and failing to disclose material facts. The potential difficulty in subjecting these questions to class action treatment is that evidence of unlawful broker conduct can depend in part, at least, on individualized oral representations made by a broker to his customer. There are authorities in support of the view that where plaintiffs' claims depend upon oral misrepresentations which differ from person to person, the question of deceptive conduct or misrepresentation may be an individual question rather than a common question suitable for Rule 23 treatment. *See e.g. In re Scientific Control Corp. Securities Litigation,* 71 F.R.D. 491, 499–508 (S.D.N.Y. 1976); *Crasto v. Estate of Kaskel,* 63 F.R.D. 18, 23 (S.D.N.Y.1974); *Ingenito v. Bermec Corp.,* 376 F.Supp. 1154, 1167 (S.D. N.Y.1974); *Skydell v. Mates,* 59 F.R.D. 297, 298 (S.D.N.Y.1972); *Morris v. Burchard,* 51 F.R.D. 530, 534 (S.D.N.Y.1971). On the other hand, where the alleged misrepresentations are so interrelated as to comprise a common course of conduct, class action has been certified, *Green v. Wolf Corp.,* 406 F.2d 291 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), and where plaintiffs' Rule 10b–5 claims are premised not on oral

misrepresentations but on a failure to disclose material information to the entire class, the claim is susceptible to class litigation. *In re Resource Exploration, Inc. Securities Litigation, MDL No. 406,* (S.D. N.Y. Oct. 15, 1984); *In re Scientific Control, supra* at 507–510; *Esplin v. Hirschi,* 402 F.2d 94 (10th Cir.1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969).

In view of the authoritative conflicting arguments that can be presented to the Court on a future Rule 23 motion, it is clear at the present time that the class motion would be contested. As a consequence, plaintiffs would be forced to expend additional time and money in pre-trial proceedings far in advance of any resolution of the merits of their actions. Without the class action device, plaintiffs would be splintered into potentially thousands of individual trials. The settling broker-dealers who have come together in parallel settlements are, in reality, business competitors who could not be reunited as a defendant class. For all of these reasons, the Court is persuaded that the immediate payment of settlement proceeds would be of greater benefit to class members than delay and uncertainty, and the resulting escalation of litigation expenses including legal fees.

## V. *Nature of the Objections*

The Court has not received any concrete factually based objections from the approximately 99,128 SPDA holders who were provided with personal notice of the proposed settlement. The forty or more letters received from individual SPDA holders, unaccompanied by legal argument, generally are briefly stated requests for either an enlargement of time or for disapproval of the settlement proposal. The only plaintiffs who have objected through counsel are the few Washington State SPDA holders represented by Joseph McKinnon, Esq.

The remaining party objections have been filed by the intervening guaranty associations for the states of Illinois, Maryland, Oklahoma, Pennsylvania, Utah and Wisconsin, who were granted leave to intervene as plaintiffs pursuant to Rule 24(b), F.R.Civ.P. by this Court's Endorsement Order dated October 5, 1984. In addition, a joint memorandum, entitled "Memorandum of the Amici States In Opposition to Proposed Class Action Settlement," and authored by the Maine Attorney General, has been filed by the attorneys general of 22 states. The Attorney General of Florida filed a separate motion to participate as an *amicus curiae* and a memorandum of law. The Maine Attorney General originally moved for permission to participate as *amicus curiae;* however, on February 25, 1985, he made an oral motion to intervene as a party and the Court granted the motion. Similarly, the Insurance Director of the State of Illinois had filed an *amicus curiae* brief before the fairness hearing, and then moved orally for an order granting intervention, which motion was granted. The Illinois Insurance Director or Commissioner moved to intervene on behalf of the insurance officials of the States of Illinois, Ohio, North Carolina, Nebraska and Oklahoma, and as a consequence they are now parties before the Court.

While the Court is interested in whatever views may aid a just and informed decision, and has considered all of the objections presented and points raised by all participants, together with the views of the settling parties' counsel, it is unclear whether the objecting attorneys general are true *amici curiae.* The role of an *amicus curiae* is to provide the Court with neutral assistance in analyzing the issues before it. *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 785 n. 16, 78 L.Ed.2d 574 (1984). In contrast to this role, the states' attorneys general, and the states' insurance officials have submitted briefs which are largely factual arguments in opposition to the settlement proposals. Even the non-settling parties, such as the intervening guaranty associations do not have firm standing to object to the adequacy of the settlements. 3 *Newberg on Class Actions,* § 566–b at 564–65 (1977), *cited in In re Beef Industry Antitrust Litigation,* 607 F.2d 167, 172 (5th Cir.1979), *cert. de-*

*nied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981). Therefore it is perplexing to read the factually based attacks upon the adequacy and fairness of the settlements from state officials who, it appears, may face potential liability and whose political and economic interests call into question their neutral status as *amici.* After reviewing many of the Plaintiffs' and Defendants' Exhibits in Support of the Proposed Settlements, the Court wonders what degree of authenticity to attach to these statements of the state officials. On one hand, these public officials argue that the problems facing Baldwin-United, NILIC and ULIC were apparent to any broker-dealer: "Finally, the relative inexperience of the former piano company and the inadequate size of its insurance subsidiaries to finance and manage billions of dollars of SPDAs were apparent at the outset even to the most casual observers." (Memorandum of the *Amici* States at 8). On the other hand, as late as April 1983, when many of the state officials were aware of meetings and discussions concerning the possible need for NILIC and ULIC to undergo rehabilitation, they seem to have been making public statements to the effect that the SPDAs were safe. (*See* Defendants' Exs. E, G–13, G–14, G–15). Since the rehabilitation period began, the objecting insurance officials have maintained silence with respect to their responsibility to monitor the financial integrity of insurance companies doing business in their states. Although the attorneys general now declare that they are charged with the enforcement of state consumer protection laws (Memorandum of the *Amici* States at 3), they apparently took no action from July 1983 until February 1985 when they filed objections to the proposed settlements. For example, the Court is not aware of any state litigation filed by the attorneys general, as *parens patriae* or otherwise against the independent insurance agents who marketed twenty to twenty-five per cent of all Baldwin-United SPDAs during the same time period, and are not sued in this federal action.

One of the major objections expressed by the intervening guaranty associations, the intervening state insurance regulators, and the states' attorneys general is that the court ordered Rehabilitation Plan carries a risk of failure and that this risk should not be shifted from the settling defendants to the SPDA owners. In essence, the objectors argue that the broker-dealers should not be permitted to obtain releases from liability now, because the Plan may later prove unable to produce the assured rate of 5.5% per annum to be paid from May 1, 1984 until November 1, 1987. The primary reason given for the objectors' suspicion that the Plan may fail to produce this 5.5% rate is that there exist unresolved issues concerning the federal tax liabilities of the Baldwin-United empire. Because Baldwin-United filed consolidated tax returns with the subsidiaries whose assets are used to calculate the assured rate, the objectors argue that these assets may be subject to possible IRS claims, none of which have yet been made.

While it is true that the impact of the IRS claims remains unsettled, the Court finds that the Rehabilitation Plan is likely to meet its goals and could provide even more than the 5.5% assured rate. First of all, as noted above, the IRS has not filed any tax claims in any rehabilitation proceeding. The only pending tax claim is that filed in the Bankruptcy Court supervising the reorganization of the parent company. There the IRS did file proofs of claim totalling approximately 450 Million Dollars. Furthermore, the Rehabilitators and the parent have entered into a settlement agreement, dated January 4, 1985, under which Baldwin-United agrees to use its best efforts during negotiations with the IRS to ensure that tax liabilities are not satisfied out of the assets upon which the 5.5% assured rate is based. There is no reason to think that the IRS would delay filing claims in the rehabilitation proceedings if the IRS has a reasonable expectation of obtaining taxes due from Baldwin-United out of the assets of the insurance company subsidiaries. Thus any fear that the IRS may file such a direct claim in the

future, thereby jeopardizing the assets of the six companies in rehabilitation remains entirely speculative.

The assured rate under the Plan is an "assured rate" because it assumes no return of income or principal from the insurance company holdings invested or "up-streamed" in securities issued by Baldwin-United and Baldwin-United affiliates. Clearly it inures to the benefit of SPDA holders that the assured rate is actuarially supported by the so-called "non-affiliated assets" which are not part of the roughly 20% of the insurance companies' portfolio that is at present frozen and unsaleable due to the parent's bankrupt status, and which eventually may turn out to be worth nothing. However, it is also clear that the assured rate is a conservative calculation which excludes the Rehabilitation assets currently having doubtful value, but which eventually could be sold, thereby increasing the basis upon which SPDA holders will recover interest from the issuing insurance companies. If the bankruptcy proceedings are successful at least in part, so that the Rehabilitators are able to earn a return on affiliated as well as non-affiliated assets, class members will receive *more* than the assured rate. There is absolutely no reason in the record before me for this Court to infer any invalidity or fraud in the Rehabilitation Plans. Quite the contrary; all indications are that the Rehabilitation courts have made valid, accurate, and indeed conservative projections. Also, there is no reason to assume that the Bankruptcy Court's proceedings concerning Baldwin-United and its non-insurance affiliates will turn out so unsuccessfully as to produce no benefit to SPDA holders from the affiliated assets. On the whole, the existence of the conjectural future tax liability of NILIC and ULIC, not yet asserted, is not an adequate basis to find that a state-approved, court-ordered Plan to restructure and supervise the issuing insurance companies will fail to produce an amount estimated only after substantial investigation and expert advice. This especially in light of the recent reports filed by the Rehabilitators who believe, reasonably, that the Plan is now operating well and making substantial progress towards its goal of reimbursing SPDA holders. (Plaintiffs' Ex. E).

The second major objection by the objecting intervenors and some of the *amici* is that the amount of the proposed settlement fund is inadequate. This issue can be reduced to the factual question of whether the settlement fund will be sufficient to yield a 2% enhancement per year for the 3 and ½ year rehabilitation period, or its equivalent if a lump sum is paid to SPDA holders in lieu of enhancement. The legal issue specifically is whether the settlement fund must fill the 2% gap between the 5.5% assured rate and the 7.5% contract rate in order to be sufficiently reasonable to warrant court approval in light of the risks of litigation.

As stated in their Memorandum in Opposition, the intervenor guaranty funds contend that "[b]ecause meeting the contract guarantees is the only way, at a minimum, that the Brokers can fairly and reasonably excuse themselves from further liability at this stage of the litigation, the settlement amounts are inadequate." The broker-dealer defendants do not claim that the settlement fund will make up the entire 2% gap; but neither do they concede liability for *any* of the plaintiffs' claims for relief. The essence of a settlement is compromise. The law favors settlements by the parties rather than by court disposition, *Newman v. Stein*, 464 F.2d 689 (2d Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) (Friendly, J.), and the central question before this Court is whether the proposed compromise is reasonable when compared to the likely results of litigation. Reasonableness is not a standard susceptible to a mathematical equation yielding a sum certain. Rather, "in any case, there is a range of reasonableness with respect to a settlement." *Id.* at 693.

The Court of Appeals has held that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought. *City of Detroit v. Grinnell*, 495 F.2d at 455. Here, plaintiffs' counsel estimates that the settle-

ments will yield an additional interest rate of approximately 1.8% per annum which is .2% less than the sum demanded by the objecting intervening guaranty funds. (Plaintiffs' Ex. D). This is somewhat more than the "fraction of the potential recovery" referred to in *Grinnell.* As Chief Judge Weinstein recently stated:

"The dollar amount of the settlement by itself is not decisive in the fairness determination. The fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate. Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case. *See, e.g. Flinn v. FMC Corp.,* 528 F.2d 1169, 1172–73 (4th Cir.1975); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974)." *In re Agent Orange Product Liability Litigation, MDL No. 381,* 597 F.Supp. 740, 762 (E.D. N.Y.1984).

While the Court has been interested in receiving comment from the various state officials who have either intervened or filed memoranda as *amici,* the important interests are those held by plaintiff class members, the SPDA holders. These persons have voiced almost no opposition to the settlements. As mentioned above, over 99.6% of all SPDA holders have elected to participate in the settlements by not requesting exclusion. The state officials should not be able to frustrate the choices of their residents, when it is the individual policyholder who stands to gain or lose relief. *See Alfred L. Snapp & Son, Inc. v.*

*Puerto Rico,* 458 U.S. 592, 600–08, 102 S.Ct. 3260, 3265–69, 73 L.Ed.2d 995 (1982); *Pennsylvania v. New Jersey,* 426 U.S. 660, 665, 96 S.Ct. 2333, 2335, 49 L.Ed.2d 124 (1976). Just and effective relief is essentially a judgment that is collectible and practical, and under the circumstances of this class action, the proposed settlements offer more than a recovery measured only by its dollar value.

The proposed settlements offer a substantial percentage recovery; moreover, they serve the public interest by treating a large class of plaintiffs equally. If plaintiffs' claims were tried individually, it would mean that a plaintiff who purchased earlier in time, when Baldwin-United was being run properly, might recover nothing while a later purchaser would recover more. The settlements are equitable because they treat SPDA holders equally and provide a fair return to all plaintiffs. *In re Agent Orange, supra,* 597 F.Supp. at 841–42.[3] Furthermore, the circumstances of this case demonstrate a special need for early resolution and finality. The average age of the thousands of SPDA holders is approximately 60 years. Many SPDA holders could die before the end of a full-scale litigation. The value of having benefits accrue at the present stage of this complex litigation is a factor which the Court should consider favorably in assessing the adequacy of the settlement. *Jones v. Amalgamated Warbasse Houses Inc.,* 97 F.R.D. 355 (E.D.N.Y.), *aff'd,* 721 F.2d 881 (2d Cir. 1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984). This Court continues to sit as a court of equity, and

---

**3.** In *In re Agent Orange Product Liability Litigation, MDL No. 381,* 597 F.Supp. 740 (E.D.N.Y. 1984), the court heard evidence from plaintiffs who expressed a "Need to Settle Now to Get on With Life." *Id.* at 771–75. The court also discussed the advantages of a classwide solution and stated:

"The transaction costs of obtaining a remedy are a proper consideration in determining substantive law. If much of a recovery will go to attorneys and experts rather than to those injured, then traditional tort remedies may be so ineffective as to put in doubt their utility in particular types of cases. Punish-

ment of defendants who cause harm and deterrence of future harmful conduct is a by-product of the traditional tort system, but it should not independently furnish the rationale for private civil litigation. Where, therefore, the transaction costs of obtaining a remedy for a class are much less per dollar recovered than they would be in a case-by-case recovery, the class action may, as a matter of policy, be the only reasonable route to recovery. Added to the costs to defendants and plaintiffs must be the cost to the public and the courts in burdening the system with large numbers of private, individual claims."

believes that the settlements are in the public's interest as well as in the best interest of the plaintiffs.

Much has been said about punitive damages. Nothing in the factual presentations which this court has heard bear directly on punitive damages, nor has it been shown to this Court's satisfaction that there is a reasonable likelihood of recovering punitive damages from any of the broker-dealer defendants in this case. The federal securities laws do not in themselves contain applicable provisions allowing punitive damages. *See Osofsky v. Zipf*, 645 F.2d 107, 111 (2d Cir.1981); *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 697 (5th Cir.1971). As for treble damages under RICO, it is improbable that plaintiffs would succeed in establishing a non-frivolous RICO violation under the recent controlling law of this Circuit. *See Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482 (2d Cir.1984), *cert. granted*, —— U.S. ——, 105 S.Ct. 901, 83 L.Ed.2d 917 (1985). While this Court cannot generalize about the law of 50 states, those state jurisdictions, somewhat less than all, which do permit punitive damages to be recovered in contract matters, allow such damages generally under tort-like conditions, where fraud, malice, gross negligence, oppression, or other willfully outrageous conduct is a part of the controversy. *See e.g. Caruso v. Republic Insurance Co.*, 558 F.Supp. 430 (D.Md.1983); *Hamilton v. Bradford*, 502 F.Supp. 822 (S.D.Miss.1980); *Cox v. Guy F. Atkinson Co.*, 468 F.Supp. 677 (N.D.Ind. 1979).

The Court fails to find anything outrageous, malicious, or oppressive in selling a SPDA issued by a duly licensed, state regulated, statutory reserve life insurance company supervised by a state or states not noted for being havens for fly-by-nights, a company licensed to do business in 49 states each of which to a greater or lesser degree in fulfillment of its police power imposed regulations on that insurance company to assure its continued solvency. Assuming that a trial jury could find that the broker-dealers could foresee that the parent corporation would manage these companies so improvidently in the future as to make them insolvent by upstreaming investment to an extent arguably permitted by law, failure to do so could hardly be found so tortiously malicious or oppressive as to support a meaningful recovery of punitive damages. Punitive damages are theoretically imposed for deterrence. Recently, demands for such relief tend to be pleaded in all actions, even breach of contract actions, principally for their *in terrorum* effect.

What conduct is being deterred here which would justify the award of punitive damages? In evaluating the settlement, the Court believes that the likelihood of recovering punitive damages anywhere on any theory against these broker-dealers is so slight as to be evanescent. It should not be the most significant factor in concluding whether the settlement should be accepted or rejected, and the Court of Appeals has so held. *Malchman v. Davis*, 706 F.2d 426 (2d Cir.1983); *City of Detroit v. Grinnell*, 495 F.2d at 458–59.

## VI. *The Propriety of Approval of the Settlements at this Time*

These settlements were noticed to the classes on two alternative methods of implementation. The first method which, for convenience of discussion, counsel have described as "the Global Enhancement Plan," calls for the deposit of assets with an unrelated insurance company of known reliability, free from an upstreaming parent. The unrelated insurance company would in effect supply to the holders of SPDAs an economic enhancement package, to be agreed upon which might include the issuance of a new or substituted enhanced annuity by the unrelated insurance company, guaranteed to yield a 2% per annum minimum enhancement for the three and one half year rehabilitation period (Stipulations of Settlement ¶ 10A). The alternative to a Global Enhancement, if such enhancement cannot be effected, provides for a lump sum payment.

Our description of the Global Enhancement Plan of Settlement is essentially

somewhat sketchy and perhaps oversimplified. To effect such a plan is beyond the power of this Court or the settling defendants. To gain a Global Enhancement will require the good will and cooperation of numerous persons, including public officials who are not before this Court. The result is one towards which all persons of good will should be motivated. Indeed this Court cannot think of any good business reason for anyone not to cooperate in achieving a Global Enhancement plan.

Such a plan will have a synergistic effect. Added to the admittedly substantial Settlement fund would be the funds to be provided by the Rehabilitators, the guaranty funds, the Baldwin-United trustee and perhaps others. More than the mere increased total in money results. In effect, after enhancement the plaintiffs and those similarly situated will find themselves in substantially the same position insofar as concerns their investment expectations as they would have been had Baldwin-United's affairs been conducted as successfully and prudently as plaintiff purchasers expected they would be.

As of the day this is written, the participants to the Settling Actions have until May 15, 1985 to agree upon a Global Enhancement. This date is subject to further enlargement by stipulation subject to Court approval, which approval would be forthcoming at this stage upon a showing of significant progress. Without assuming that a specific dollar amount will be available for Global Enhancement, but believing that a sum which this Court will regard as substantial will be forthcoming from nonparties, the Court can and does hold that a Settlement contemplating a Global Enhancement Plan is clearly reasonable and beneficial to the class and shall be approved.

Optimistic as we may be about the prospects of a successful Global Enhancement, we should nevertheless consider whether the alternate form of the proposed settlement which is presented for approval, assuming all efforts to achieve a Global Enhancement fail, is also fair and reasonable.

Under the alternative applicable under the proposed settlements if Global Enhancement fails, there will be lump sum cash payments by the settling defendants for distribution after fees and costs as set forth *infra* in Section VIII. If, as this Court believes, this settlement fund is the maximum amount of money which may be achieved by arms length bargaining among the knowledgeable and skilled participants, by means short of total litigation, and also if the amount being paid is consistent with the litigation value of the claims being settled, as it appears to be, then the settlement clearly should be approved even absent a Global Enhancement Plan.

There is no certainty in matters such as determining whether a bargained-for settlement is the maximum which may be obtained by negotiation. While all evidence before me suggests that it is, some disturbing clouds have appeared on the horizon since the settlement hearing on February 25 and 26, 1985. The source of the clouds overhanging what appears on this Court's examination to be a most generous settlement produced by successful bargaining seems to exist in the form of actions and threats of certain state regulatory officials.

By documents submitted to this Court on March 28, 1985, a settling broker-dealer alleged in substance that a public official in a single state had attended a meeting on October 3, 1984 in the office of a public official of another state at which representatives of a large number, but less than 50, states were present. Thereafter, under date of October 5, 1984, a respected national newspaper reported that:

"Insurance regulators and attorneys general from 37 states said they will begin legal moves against insurance agents and brokerage firms that sold Baldwin-United Corp. annuities. The state officials meeting in Atlanta, said they hope the action will *persuade* the annuity sellers to contribute to a cash fund to pay the holders of Baldwin annuities. * * * Last month, 12 major brokerage firms agreed to pay $135 million to settle class-action suits filed by annui-

ty holders. * * * *The brokers that did settle may still be targets of legal action,* [a deputy attorney general] said." (Emphasis added).

This Court is informed that the insurance director of one state, and/or its attorney general has demanded of one settling defendant that it pay more than is required by the proposed settlement agreements on file in the MDL action, to SPDA purchasers who are now or who were resident in that state at the time of purchase. The settling defendant was tendered an instrument which required agreement to make this additional payment, and allegedly was informed in effect that unless the settling broker-dealer agreed, *inter alia,* to guarantee its customer SPDA holders resident in that state, more money or greater benefit than is provided under the stipulations of settlement, that state would institute public hearings against the settling broker-dealer to revoke its state license. (*See* Exhibit 5 to the Affidavit of James B. Weidner, sworn to March 27, 1985).

As another example of what this Court discerns as "clouds overhanging the proposed settlements," the Court has reviewed another letter authored by a state attorney general, dated February 27, 1985 which states to an attorney for a plaintiff in one of the consolidated MDL actions that "the NAAG Committee and other state regulators will continue to push the settling defendants, including [named broker-dealer], to pay more than 5.5% of its May, 1984 SPDA liabilities." (Exhibit M to the Affidavit of Richard E. Carlton, sworn to March 18, 1985). As a third example, on January 29, 1985, a meeting took place in New York between representatives of three other states and certain of the broker-dealers. The state representatives provided a written "settlement proposal" which offered to terminate all pending and future administrative proceedings in exchange for broker-dealer payments of 6.8% of the May 1, 1984 accumulated value of SPDAs sold in those states through each broker-dealer. (Exhibit L to affidavit of Richard Carlton, sworn to March 18, 1985). Thus approximately one month before the fairness hearing scheduled by the Court, three states attempted to obtain restitution for their residents in an amount 1.3% greater than the amount agreed in the stipulations of settlement filed with the Court beginning in September 1984. These three states offered to withdraw any opposition to the proposed settlements with respect to the broker-dealers who would participate in this additional "settlement", benefiting residents of only three states.

As a fourth but not a final example, the attorney general of yet another state prepared a draft complaint under a state RICO statute against certain of the settling and non-settling broker-dealer defendants, which complaint essentially seeks a forfeiture to the state of all profits derived from SPDA sales. At the same time he provided a copy of the draft complaint to the defendants for inspection, that attorney general also provided a proposed consent agreement setting forth a settlement by which the broker-dealer would pay "to the State ... for deposit in the State Treasury," a substantial sum of money. According to an affidavit filed with this Court, this state's attorney general stated orally and contemporaneously with providing a copy of the draft complaint and the proposed settlement, that he "still had two overall objectives: to get as much back as possible for [his state's] investors and to deter such conduct from occurring in the future." This statement suggests that any money paid voluntarily into the State Treasury will be disbursed only to investors resident in that state.

The trade of a broker-dealer in securities is one of the most highly regulated industries in America today. Besides the federal statutes cited previously there is a vast body of interstitial state regulation pursued with varying degrees of fervor in different jurisdictions. Second only to the securities industry in the pervasiveness of its regulation is the sale of insurance, except that the bureaucratic omnipresence in insurance is imposed under state law rather than federal.

Nobody, especially not this Court, would question the right of state regulators to investigate whether the insurance licenses of those who sold these SPDAs should be suspended or revoked, or whether the licensees should be fined for whatever state law violations may be proved against them, or which they may confess. No such violations in significant number have come to the attention of this Court, but all participants in the Baldwin-United debacle have shown that the Emperors of state insurance regulation had no clothes. That they or some of them should seek a scapegoat is hardly surprising. It seems, from public utterances widely reported in the press, that in perhaps as many as twenty-two states, officials empowered to review licenses and/or impose penalties to satisfy the interests of the public as sovereign, intend to use such power, not to vindicate the public interest but rather to "pressure" or coerce or extort the broker-dealers to make additional payments to or for the benefit of the class members situated in their own state(s).

This Court is not officially concerned with this threat of coercion facing the broker-dealers. It is greatly concerned with the proper management of this federal securities action. Does the likelihood of different and inconsistent payments to the class members depending on the state in which they reside or did reside when they bought their SPDAs, and brought about by such coercion militate against a finding that this is the best possible cash settlement (apart from Global Enhancement) which the class could achieve short of litigation? In posing this question we assume for purposes of the discussion that at some later point in time, one or more of the settling defendants might cave in to official "pressure" or extortionate demands and sweeten the pot further, but only for the

residents of one, two, thirty-seven or less than 50 states. Is this Court justified in granting approval of settlement of a nationwide federal securities class action claim on a uniform nationwide basis where there is a possibility that the ultimate outcome will be distorted, resulting in unequal treatment which will depend on the state of residence of the individual SPDA purchaser?

On studied reflection and consideration of this possibility, this Court concludes that its existence does not militate against our factual finding that the settlement as proposed represents the full value for the settlement classes, is fair and reasonable and should be approved nonetheless. This Court cannot, in the long run, prevent official oppression, extortion, or "pressure" however described. Such conduct, if accurately described in the source materials cited *supra* at pp. 49–50, is unlawful, and in violation of state and federal statutes which forbid the exaction of payments to the actor or another under "pressure" or under color of any statute, custom or position as a public servant. *Cf.* New York Penal Law § 155.05(2)(e)(viii); 42 U.S.C. § 1983.[4]

Apart from the quasi-criminal aspects of the proposed conduct publicly described by these state officials as "pressure", there is also the likelihood that one or more state officials may seek to assert directly or derivatively or as *parens patriae*, the claims of the settling class members arising out of the sale to them by the settling broker-dealers of the SPDAs. That this would not command much likelihood of success must be obvious because otherwise there would be no need or desire to resort to coercion or "pressure," or other questionable tactics. We note in passing that the final judgment to be entered hereunder will bar, perma-

---

**4.** One broker-dealer has already filed a cross claim against an intervening state insurance superintendent, containing two counts under the Civil Rights Act of 1871, 42 U.S.C. § 1983. The first count alleges that the superintendent's conduct shows that he is predisposed to revoke the broker-dealer's license and also that the proceedings require the superintendent to evaluate the performance of his own statutory duties, thus creating an impermissible bias which deprives the defendant of his due process rights. The second count alleges a second § 1983 violation, "to wit, an abuse of process, as a pretext to coerce [the broker-dealer] to perform acts" which the superintendent is not authorized by law to seek.

nently, all settling class members, directly and indirectly, their successors and those acting on their behalf ever hereafter from asserting any claim against any of the settling broker-dealers in connection with any matter arising out of the sale of the SPDAs. Paragraph 21 of the Stipulations of Settlement has by its terms the effect of a General Release of all such claims, and by Paragraph 23A, thereof, the same Stipulations provide in relevant part:

"23(A). *To the extent that* any Settling Class member, or *anyone on behalf of a Settling Class member* or an behalf of the Settling Class in whole or in part (together, the "Asserting Settling Class member"), *asserts any claim relating to the purchase, transfer, sale or ownership of SPDAs issued by the Companies against the Settling Defendants,* or against

(i) any settling defendant other than the Settling Defendant who sold to such Settling Class member, or

(ii) any entity or person other than the Settling Defendant who then claims, or may later claim, over against any one or more of the Settling Defendants

(hereafter the "Third Party" means anyone in subparagraph (i) or (ii) above), *that Asserting Settling Class member shall reduce or consent to a reduction of any judgment recovered* against, or return any collection obtained by the Asserting Settling Class member from, the Settling Defendant and/or the Third Party *to the extent of such Settling Defendant's adjudicated share of the judgment."* (Emphasis added).

■ Accordingly, any such action, from and after our approval of this settlement, would confer no benefit on a member of the settlement class. In light of the totality of the evidence before the Court, we have no hesitancy in approving the settlements, recognizing that any such claims will be barred, because we find that even without Global Enhancement, the settlement fund and the relatively prompt resolution of a highly complex set of claims confers a generous benefit to plaintiff class

members. The recovery is a reasonable, fair and adequate sum which results from the negotiations of skilled adverse counsel who were capable of evaluating the strengths and weaknesses of these consolidated cases.

## VII. *Treatment of Opt-outs*

The future protection of the rights of those who opted out concerns the Court. As noted earlier, we received 323 opt-outs. These opt-outs were geographically distributed in a highly uneven manner, with no more than 53 in any single state (Alabama), and none at all in some states.

■ This Court views the form of notice issued to the class members as being no more complicated or extensive than the matter at hand required. The total presentation of facts in any such notice is generally regarded, and this Court finds it to be, an essential element of due process, implicating as it does, the opportunity to be heard or to opt-out. The risk commonly experienced, and present here, is that on receiving a sufficiently complete notice to satisfy the requirements of due process, some persons may become confused and, affected by the understandable suspicion widely held by lay persons concerning court papers, may opt-out thoughtlessly and without professional advice.

It would be unfair to leave persons out of the group benefiting from the settlement, where opt-outs may have been filed without full knowledge or understanding of the benefits which could be derived contrasted with the likely result of opting-out.

This Court directs that any person who has previously opted-out of the settlement class who wishes to reenter the class and benefit from the settlement may elect to do that by an appropriate written instrument to be delivered and filed within 30 days after receipt of a notice following ascertainment of whether or not the settlement will include a Global Enhancement. As a condition for opting back into the settlement class, execution of a general release and any other appropriate instruments may be required by settling defendants. This

Court reserves jurisdiction to approve the form and content of the notice and any subsidiary forms to be sent to the persons who formerly opted-out but who may opt-in at a future date, when it is finally known whether a Global Enhancement Plan will in fact be implemented.

VIII. *Legal Fees*

The terms of the settlement agreements provide that the legal fees of counsel who produced the settlements for plaintiffs shall be paid out of the settlement fund in an amount to be fixed by the Court, not greater than 5% of the recovery.

All attorneys for plaintiffs, other than Joseph McKinnon, Esq., have made a joint application for attorneys fees and disbursements. Mr. McKinnon has made a separate application which is opposed by the plaintiffs' liason counsel, unless this Court should find that his participation aided in effecting the result. Such a determination may require a separate evidentiary hearing.

As they are required to do, the counsels' joint fee application contains the affidavits and billing records concerning time charges through the date of November 30, 1984. This showed hourly time charges in excess of 15,745 hours. In addition, counsel requested a multiplier, in light of the results achieved. The requested multiplier would not cause the fee award to exceed the 5% limitation placed thereon in the settlement agreements and notice to the classes, which also provides for an additional fee not in excess of 2% of the recovery in the event that appellate proceedings are necessary.

The defendants have no financial concern which of the two alternatives is followed, although they would prefer a Global Enhancement Plan as more beneficial to their customers and therefore likely to restore any customer good will lost by reason of the sales of SPDAs. The parties to these cases cannot, acting alone effectuate a Global Enhancement. Such a procedure, as noted, would require the cooperation and efforts of many participants, including regulatory officials in more than one state, and the Rehabilitators, as well as the possible approval of the Bankruptcy Court and the consent of those charged with administering the affairs of Baldwin-United. To obtain the necessary approvals to effect the Global Enhancement will require considerable effort and much tact, diplomacy and professional skill.

The attorneys for the plaintiff class have been working diligently on the problems connected with the Global Enhancement, and to this Court's knowledge, have expended considerable additional hourly time charges since November 30, 1984 which is not set forth in their application for legal fees submitted at the hearing of February 25, 1985. Furthermore, if counsel do succeed in effecting a Global Enhancement, and their efforts contribute, along with that of others in this litigation, and the efforts of non-parties, in effecting a Global Enhancement, the net benefit to the plaintiff classes will be far greater than the remaining or fall back option of settlement by lump sum payment, found in the settlement agreements at ¶ 11.

And, if the lawyers for plaintiffs play a substantial part in achieving a Global Enhancement, as opposed to a cash payout from settling defendants, they would be in a position to make a far stronger argument for a much larger multiplier, based upon the successful result achieved. Further there is the likelihood of appellate review in the matter, which will require additional services on the part of the lawyers for plaintiffs. Obviously, no fee payments can be made in any event until there is a final judgment, not subject to further appeal.

This Court believes that it would be improvident at this time to make a determination concerning fees, at least until the Court knows whether the Global Enhancement will in fact be achieved, and is able to include in its findings some determination as to the nature, and extent, and value of the participation of the plaintiffs' attorneys in achieving such a Global Enhancement agreement. Furthermore, the lodestar in this case has only been computed through the date of November 30, 1984. In the interests of fairness, the lodestar should at

very least be brought down to the date of the final judgments to be entered on these findings and conclusions.

Insofar as concerns the application by Mr. McKinnon the Court may be required to take further proof so as to permit the Court to find whether his participation did advance the cause, and if so, to what extent. While this is a relatively minor problem, it seems reasonable that all fees should be resolved together, and within the total outer limits provided by the settlement agreements.

Accordingly, the Court determines that the resolution of the fee request should be deferred at least pending such time as the Court shall be able to determine whether the Global Enhancement can be achieved, and if it is, to determine also the nature, extent and participation of the plaintiff law firms in achieving that result, a fact which in turn will affect the Court's decision as to an appropriate multiplier for the legal fees.

The issue of legal fees shall be severed and jurisdiction shall be reserved to determine these issues at a later date. For purposes of approving the proposed settlements, it is sufficient for this Court to observe, and it does find, that the plaintiffs' attorneys rendered extremely valuable services in a highly diligent and faithful manner under difficult and complex circumstances. They played a part in achieving a highly favorable result, and indeed the result is favorable even if Global Enhancement cannot be accomplished, as this Court believes it can be. The attorneys will be entitled to some multiplier; whether or not in the amount requested it is premature to decide. Since in no event will the fee exceed 5% of the recovery or 7% in the event appellate proceedings are necessary, an exact determination of the final amount of the fee is not directly relevant to the Court's determination as to whether the settlement is fair and reasonable.

In connection with its findings concerning fairness and reasonableness, the Court concludes and finds that even if the legal fees paid extend in full to those limitations, the settlements are nonetheless beneficial, fair and reasonable, and compare favorably with the recovery of the classes were the matter to proceed to trial.

### IX. *Conclusion*

The joint application for the approval of the stipulations of settlement filed in the eighteen (18) aforementioned class actions, is hereby granted. There is no just cause for delay. Rule 54(b), F.R.Civ.P. Jurisdiction is reserved for the purpose of deciding the application for attorneys' fees and expenses and to supervise implementation of the settlements. Eighteen (18) separate judgments shall be entered by the Clerk.

So Ordered.