Reversed and Remanded and Majority Opinion filed December 23, 2003
















Reversed and
Remanded and Majority Opinion filed December 23, 2003.

 

 

In The

 

Fourteenth Court
of Appeals

____________

 

NO. 14-03-00366-CV

____________

 

ALENIA SPAZIO, S.P.A. AND FINMECCANICA,
S.P.A., Appellants

 

V.

 

DENNIS A. REID, Appellee

 

__________________________________________________

 

On Appeal from the 281st District
Court

Harris County, Texas

Trial Court
Cause No. 02-12305

 

__________________________________________________

 

M A J O R I T Y   O P I N I O N

            Appellants Alenia
Spazio, S.p.A. and Finmeccanica, S.p.A.
(collectively, the “Italian Companies”) bring this interlocutory appeal from
the trial court’s order denying their special appearances in a lawsuit filed by
appellee Dennis A. Reid (“Reid”).  We reverse the trial court’s order and remand
with instructions to dismiss the claims against the Italian Companies for lack
of personal jurisdiction.








I.  Factual and Procedural
Background

            Reid, a Canadian citizen, brought
the underlying suit asserting a host of derivative claims against several
defendants, including the Italian Companies — two foreign-resident corporations
organized under the laws of Italy and having
their headquarters and principal places of business in Rome, Italy.  The claims involve an alleged business venture
for the commercialization of Russian satellites and orbital slots. 

            The
dispute arose from Russia’s need to
replace several obsolete satellites to avoid losing certain of its
geosynchronous orbital slots. The Russian Satellite Communications Company (“RSCC”)
was responsible for allocating and licensing Russian satellite communication
frequencies.  Dr. Valery
Aksamentov, a Russian space scientist who lived and
worked in Houston, Texas, learned
from a relative who worked for RSCC that Russia might lose
certain orbital slots because it could not afford to replace several obsolete
satellites.  After learning about this
situation, Aksamentov developed a plan to
commercialize these orbital slots and then, with funding from outside Russia, build,
launch, and operate new satellites to maintain them.  This plan was called the Gorizont
Satellite Replacement Program (“Plan”).  Aksamentov worked with RSCC to obtain approvals from the
Russian government to commercialize these orbital slots.  In 1997, Aksamentov
and others formed U.S. Russian Telecommunications, L.L.C. (“USRT”), a Delaware
limited-liability company, to further develop the Plan, which included the
launching and building of satellites to fill the orbital slots.

            According to Reid’s pleading, in
1997, USRT and the Italian government began discussing funding for the
Plan.  Admiral Giorgio Capra of the
Italian Navy was present during these discussions. Capra soon brought the Alenia Spazio division of Finmeccanica, S.p.A.[1] into
the discussions.  Communications
concerning a potential business relationship 

 class=Section3>

between
Alenia and USRT ensued.  Phone calls were made and faxes were sent
between Alenia in Italy and Aksamentov at his home in Houston. Reid
alleges that in December of 1997, an oral joint venture was created between
USRT and Alenia at a meeting in Rome.  In January of 1998, representatives of USRT
and Alenia met in Moscow.  That same month, two Alenia
representatives spent one day in Houston
negotiating a Memorandum of Agreement (“MOA”). 
A representative of Alenia signed this MOA (“January 27, 1998 MOA”) in Italy. 

            RSCC transferred its control of the
orbital slots to Inspace, another Russian company, in
the spring of 1998.  In April of the same
year, USRT, Alenia, and Inspace
signed an MOA, the first signed by these three parties, in which they outlined
various concepts that might be used to develop and implement the Plan; however,
this MOA stated that “[e]xcept as to the
confidentiality provisions of Section 6 which is meant to be binding, this
Memorandum is expressly acknowledged to be an aid to further discussions
between the Parties and neither creates nor implies the existence of any
contractual rights or obligations among the Parties as to the subjects
addressed herein.”  

            Shortly thereafter, Alenia and USRT signed another MOA (“May 12, 1998 MOA”) which expressly
superseded the January
 27, 1998 MOA.  The May
12, 1998 MOA contained a provision choosing the laws of the United Kingdom and
providing that London would be the place for arbitration of any disputes
between the parties.  The May 12, 1998
MOA stated that, upon the execution of a legally enforceable contract and upon
acquiring sufficient financing, Alenia would purchase
fifty percent of the equity of USRT. 
However, any obligations that might have existed under the May 12, 1998 MOA were expressly
conditioned on the acquisition of credit facilities for $450 million and $100
million.  Reid alleges in his petition
that this funding was never obtained, and the Italian Companies agree that this
is correct.  

            On May 15, 1998, Alenia,
USRT, and Inspace signed an MOA (“May 15, 1998 MOA”) that superseded the
April 1998 MOA.  This MOA stated that
“[e]xcept as to [certain confidentiality and
exclusivity provisions] which are meant to be binding [sic] this MOA is
expressly acknowledged to be an aid to further discussions among the Parties in
order to reach binding, final agreements on the subject matter hereof and
neither creates nor implies the existence of any contractual rights or
obligations among the Parties as to the subjects addressed herein.” In May of
1998, Aksamentov faxed a letter to Alenia requesting a $100,000 advance of a $500,000 loan to
cover USRT operating costs.  Alenia subsequently wired $50,000 to a bank in Pennsylvania to be
forwarded to a USRT account.  Alenia’s wiring instructions indicated that USRT had a Roswell, Georgia address,
but USRT produced a USRT account that reflects a $50,000 credit, and shows a Houston, Texas address.

            According to Aksamentov,
the “Italians” recommended that USRT should be wholly owned by an Italian
citizen to increase the chances of funding from the Italian government.  Reid alleges that USRT was sold in October of
1998 to USRT Holdings, L.L.C., a Delaware company
owned by Capra (then retired from the Italian Navy).  According to Reid, USRT was purchased for
$300 million, to be paid from future revenues earned by USRT in the alleged
joint venture.  Aksamentov
was chairman of the board and chief executive officer of USRT before its sale;
after the sale, he remained chairman of the board but was chief operating
officer for Russian Affairs rather than chief executive officer.  Reid alleges that Capra became the chief
executive officer after the sale.   
Later, in March of 1999, Aksamentov resigned
from all of his positions with USRT. 
Reid was appointed chief financial officer of USRT after its
acquisition, and Jon Reed was made its president.  Capra gave a five percent ownership interest
in USRT Holdings to each.  Reid later
acquired Reed’s five-percent interest.

 class=Section4>

            Reid claims that in May of 1999, Davide Siniscalchi, USRT’s chief operating officer, told him about a meeting
that had taken place in Rome on May 19, 1999, between Capra and Giuseppe Viriglio of Alenia, during which
the two men allegedly discussed a proposal in which USRT would transfer its
rights in the alleged joint venture to Alenia in
exchange for Alenia “issuing” a lump sum payment of
between $20 million and $30 million as well as unspecified future compensation
to Capra, Siniscalchi, Reed, and Reid.  Reid contends this arrangement would have
allowed USRT to avoid financial obligations to its former members by ensuring
that USRT did not earn any income from the alleged joint venture.  Reid asserts that he and Reed both refused to
participate in this proposal and were fired in August of 1999.  Reid alleges Alenia
later terminated the May 12,
 1998 MOA and the alleged joint-venture agreement on grounds that
implementation of the Plan was too remote and unlikely.[2]  The record shows that, on December 20, 1999, Alenia sent a letter to Siniscalchi
stating that the May 12, 1998 MOA was no longer in effect and indicating that
there was no relationship between USRT and Alenia
regarding the Plan.  Reid alleges the
first replacement satellite was launched in late 1999, with financing from Alenia, but without USRT involvement.  Reid also contends additional satellites have
since been launched and are being developed. 

            Reid filed derivative claims on
behalf of USRT and USRT Holdings, L.L.C. against the Italian Companies, Siniscalchi, and Capra. 
These claims relate to the alleged joint-venture agreement.[3]  The Italian Companies filed special
appearances contesting personal jurisdiction. 
After a hearing at which no additional evidence was presented, the trial
court denied the special appearances.  By
this interlocutory appeal, the Italian Companies now challenge the trial
court’s decision.

 class=Section5>

II.  Standard of Review

            Whether the Italian Companies are
subject to personal jurisdiction in Texas is a
question of law subject to de-novo review. 
BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d
789, 794 (Tex.
2002).  The trial court did not issue any
findings of fact or conclusions of law. 
Therefore, all facts necessary to support the trial court’s ruling and
supported by the evidence are implied in favor of the trial court’s
decision.  Id. at
795.  Parties may challenge the legal and
factual sufficiency of these implied factual findings.  Id.  In conducting a no-evidence analysis, we
review the evidence in a light that tends to support the disputed findings and
disregard all evidence and inferences to the contrary.  Lee
Lewis Constr., Inc. v. Harrison, 70 S.W.3d
778, 782 (Tex.
2001).  If more than a scintilla of
evidence exists, it is legally sufficient. 
Id.  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about a vital fact’s existence.  Id. at
782–83.  

            When reviewing a challenge to the
factual sufficiency of the evidence, we examine the entire record, considering
both the evidence in favor of, and contrary to, the challenged finding.  Cain v.
Bain, 709 S.W.2d 175, 176 (Tex.
1986).  After considering and weighing
all the evidence, we set aside the fact finding only if it is so contrary to
the overwhelming weight of the evidence as to be clearly wrong and unjust.  Pool
v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex.
1986).  The trier
of fact is the sole judge of the credibility of the witnesses and the weight to
be given to their testimony.  GTE Mobilnet of S.
Tex. v. Pascouet, 61 S.W.3d 599, 615–16 (Tex.
App.—Houston [14th
Dist.] 2001, pet. denied).  We may not
substitute our own judgment for that of the trier of
fact, even if we would reach a different answer on the evidence.  Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex.
1998).  The amount of evidence necessary
to affirm a judgment is far less than that necessary to reverse a judgment.[4]  Pascouet, 61 S.W.3d at 616.

III.  Analysis and Discussion

            In their two issues, the Italian
Companies challenge the trial court’s implied findings of specific and general
jurisdiction.  The Texas long-arm
statute governs Texas courts’
exercise of jurisdiction over nonresident defendants.  Tex. Civ. Prac. & Rem.Code §§ 17.041– .045; Guardian Royal Exch. Assur. Ltd. v. English
China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex.
1991).  It allows courts to exercise
personal jurisdiction “as far as the federal constitutional requirements of due
process will permit.”  BMC Software, 83 S.W.3d at 795.  Thus, we rely on precedent from the United
States Supreme Court and from other federal courts, as well as Texas decisions,
in determining whether a nonresident defendant has shown the exercise of
personal jurisdiction violates federal due process guarantees.  Id.

            Personal jurisdiction over a
nonresident defendant is constitutional when two conditions are met: (1) the
defendant has established “minimum contacts” with the forum state, and (2) the
exercise of jurisdiction comports with “traditional notions of fair play and
substantial justice.”  BMC Software, 83 S.W.3d at 795.  A nonresident defendant that has
“purposefully availed” itself of the privileges and benefits of conducting
business in Texas has
sufficient contacts to allow Texas courts to
exercise personal jurisdiction over the nonresident.  Id.  Although not determinative, foreseeability is an important consideration in deciding
whether the nonresident defendant has purposefully established “minimum
contacts” with Texas.  Id.  The concept
of “foreseeability” is implicit in the requirement
that there be a “substantial connection” between the Italian Companies and Texas arising
from the Italian Companies’ conduct purposefully directed toward Texas.  See
Guardian Royal Exch. Assur., Ltd., 815 S.W.2d at
227.  A defendant should not be subject
to a Texas court’s
jurisdiction based upon random, fortuitous, or attenuated contacts.  BMC
Software Belgium, N.V., 83 S.W.3d at 795. 

A.        Did the trial court properly conclude
that it could exercise personal jurisdiction over the Italian Companies based
on specific jurisdiction?

 

            In
conducting a specific-jurisdiction analysis, we must focus on the relationship
among the Italian Companies, Texas, and the
litigation.[5]  See
Guardian Royal Exch. Assur., Ltd., 815 S.W.2d at
228. 
Specific jurisdiction exists when the plaintiff’s claims arise from
or relate to the defendant’s purposeful contacts with Texas.  American
Type Culture Collection, Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex.
2002).  Reid argues the Italian Companies
are subject to specific jurisdiction in Texas for the following reasons: (1)
Reid’s breach-of-contract claim arises from or relates to the Italian
Companies’ purposeful contacts with Texas; (2) the evidence shows that the
Italian Companies’ alleged tortious conduct occurred,
in part, in Texas; and (3) the Italian Companies engaged in alleged tortious conduct outside of Texas that was expressly aimed
at Texas, knowing that the brunt of the injury from their conduct would be felt
by USRT in Texas.

 

Reid’s Breach-of-Contract Claim

            Reid alleges that the Italian
Companies breached an oral joint-venture agreement with USRT that allegedly was
formed in Italy in
December of 1997.  Reid claims the
Italian Companies breached this agreement by excluding USRT from the Plan and
by failing to share revenues received from the execution of the Plan.  The Plan contemplated obtaining rights from
the Russian government to certain orbital slots for communications satellites.  These satellites were to have been
manufactured by Alenia in Italy with
financing from the Italian government, and then placed in geosynchronous orbit
over Russia by means
of launches from stations located in Russia.  Reid’s affidavit indicates that, on May 19, 1999, in Rome, Alenia and USRT discussed the possibility of USRT
transferring any and all rights in the Plan to Alenia;
however, there is no indication in the record that such a transfer ever
occurred.[6]  Rather, Reid’s affidavit states that he and
Jon Reed were terminated from their respective positions at USRT in August of
1999, immediately after they refused to go along with such a transfer of rights
by USRT.[7]  According to Reid, after these events, in
late 1999, Alenia began implementing the Plan without
USRT’s participation. 
Virglio’s deposition shows that, on December
20, 1999, Alenia sent a letter to Siniscalchi
in Illinois, as a representative of USRT, stating that the May 12, 1998 MOA was
no longer in effect and indicating that there was no relationship between USRT
and Alenia regarding the Plan.  Therefore, the Italian Companies’ alleged
breach of the purported oral joint-venture agreement occurred in late 1999,
when, Reid claims, the Italian Companies put the Plan into effect without USRT’s participation.[8]  

            Reid asserts his claims based on his
stock ownership in USRT Holdings and by means of a double derivative action in
which, acting on behalf of USRT Holdings, he asserts a claim on behalf of
USRT.  See Tex. Bus. Corp. Act art.
5.14K (stating that derivative actions involving foreign corporations are governed
by the law of the state of incorporation, except as to procedural issues not
relating to the internal affairs of the corporation); Sternberg v. O’Neil, 550 A.2d 1105, 1124 (Del. 1988) (describing
double  derivative action under Delaware
law).  Though Reid is asserting a
breach-of-contract claim that allegedly belongs to USRT, any recovery in this
case would go to USRT Holdings, not USRT. 
See Sternberg, 550 A.2d at
1124.  

            Reid
asserts that this breach-of-contract claim arises from or relates to the
following contacts with Texas:

!         Alenia’s alleged joint-venture agreement with USRT, a
company that Reid claims had a principal place of business in Houston, Texas, at all material times;

!         Alenia’s negotiation in Houston, Texas of the January 27, 1998 MOA relating to the alleged joint venture;

!         Alenia’s entering into the MOAs
that contemplated performance, in part, in Texas;

!         Alenia’s numerous communications with Texas by telephone and facsimile;

!         Alenia’s wiring money to USRT in connection with the alleged
joint venture.

 

            In many respects the facts are not
disputed, but the parties vigorously dispute the principal place of business of
USRT.  Reid claims that it is in Texas, and the
Italian Companies claim it is in Georgia.  Aksamentov admitted
in his affidavit that the MOAs between Alenia and USRT state that USRT’s
principal place of business is in Roswell, Georgia.  Further, USRT sent Alenia
a document entitled “Brief History of USRT” that stated “[o]perations
of USRT are directed from USRT’s offices in Atlanta, Georgia.”  Other evidence suggests the principal place
of business may have been in Texas.  Aksamentov
testified that, in January of 1998, he sent Alenia a
copy of USRT’s “operating agreement.” Although he
does not further describe this document, and though our record contains no
document by that name, we presume for the sake of argument that Aksamentov sent Alenia the USRT
Limited Liability Company agreement that is contained in our record.  This document states that as of January 3, 1997, the principal
office of USRT is in Houston, Texas.  

            Under the applicable standards for
evaluating the conflicting evidence as to the location of USRT’s
principal place of business, we conclude that there is legally and factually
sufficient evidence to support the trial court’s implied finding that USRT had
a principal place of business in Texas from its
creation until August of 1999.  However,
we find the evidence legally insufficient to support an implied finding that USRT’s principal place of business was in Texas after
Reed’s termination in August of 1999. 
The uncontroverted evidence shows that USRT
never had any employees, that USRT did not compensate its officers, and that
the only activities conducted by USRT were actions taken by its officers
relating to the Plan.  In this context,
it is somewhat difficult to determine what the principal place of business of
USRT was at any given time.  Nonetheless,
there is no evidence in the record of any remaining officers operating in Texas, or of any
activity by USRT in Texas, after
USRT terminated Reed in August of 1999.[9] 

            Based on our evaluation of the
quality and nature of the Italian Companies’ contacts with Texas, we
conclude that their alleged breach of contract did not arise from or relate to
these contacts.  See Guardian Royal Exchange Assur., Ltd., 815 S.W.2d at 224 n.11 (Tex. 1991)
(stating that, in analyzing minimum contacts, it is not the number, but rather
the quality and nature of the nonresident defendant’s contacts with Texas that is
important).  The Italian Companies are
alleged to have breached an oral joint-venture agreement, allegedly created in
Italy, that concerned the Plan — a program that was centered in Italy and
Russia and involved financing from the Italian government and approval of the
Russian government.  

 class=Section6>

The Italian
Companies allegedly breached this contract in late 1999, when they went forward
with the Plan, in Italy and Russia, without USRT’s participation. 
At the time of this alleged breach, USRT did not have its principal
place of business in Texas.  Further, after October of 1998, and at the
time of the alleged breach, USRT was wholly owned by USRT Holdings, which is
ninety percent owned by an Italian citizen (Capra) and ten percent owned by a
Canadian citizen (Reid).  Even though USRT’s principal place of business may have been in Texas
until August of 1999, Reid’s claim seeking monetary recovery in favor of USRT
Holdings — based on the breach of an alleged agreement made in Italy and
allegedly breached in Russia and Italy — does not arise from or relate to the
Italian Companies’ purposeful contacts with Texas.  See
American Type Culture Collection, Inc., 83 S.W.3d at 806; Magnolia Gas Co. v. Knight Equip. &
Mfg. Corp., 994 S.W.2d 684, 691–93 (Tex. App.—San Antonio 1998, no pet.)
(finding no specific jurisdiction over contract assignees despite contract with
Texas
corporation, partial performance in Texas,
communications with Texas, and
sending  payments to Texas).  

            Contracting with a Texas entity
alone does not satisfy the minimum-contacts requirement.  See Old
Kent Leasing Servs. Corp. v. McEwan, 38 S.W.3d 220, 230 (Tex. App.—Houston [14 Dist.]
2001, no pet.).  Here, there is also some
evidence of funds being credited to a USRT account with a Texas
address.  Although it is not clear that Alenia knew that the payment was going to a Texas account
because the wiring instructions indicated that the money was being sent to a
bank in Pennsylvania, to be forwarded to USRT, the record contains evidence
that Alenia wired $50,000 to USRT and that this
amount was credited to a USRT account with an address in Houston, at a time
when USRT’s principal place of business was in
Texas.  Nevertheless, sending funds to Texas is not
determinative.  See Shell Compañia Argentina De Petroleo, S.A. v. Reef Exploration, Inc., 84 S.W.3d
830, 839 (Tex. App.—Hous. [1 Dist.] 2002, no pet.).  Likewise, numerous telephone and facsimile
communications with people in Texas relating
to an alleged contract do not establish 

 class=Section7>

minimum
contacts.  TeleVentures, Inc. v. International Game Tech., 12 S.W.3d 900, 910 (Tex.
App.—Austin 2000, pet. denied); Magnolia
Gas Co., 994 S.W.2d at 691–92.   

            Reid relies on Fish v. Tandy Corp., 948 S.W.2d 886, 895 (Tex. App.—Fort Worth
1997, pet. denied).  The Fish court found specific jurisdiction
in a Texas
corporation’s action for a declaration of the rights and duties under a letter
agreement executed by the nonresident defendant and the Texas
corporation after negotiations that included personal visits by the defendant
to Texas.  See id.
at 890–95.  In this case, however, the
basis of Reid’s suit is his allegation of an oral joint-venture agreement
allegedly formed during a meeting in Italy in
December of 1997.  There is no evidence
of prior negotiations regarding this alleged joint venture in Texas.  Therefore, we conclude Fish is distinguishable.

            Although the evidence shows that two
Alenia representatives negotiated the terms of the January 27, 1998 MOA during
a one-day meeting in Houston, Alenia signed this
document in Italy.  Furthermore, the January 27, 1998 MOA was
superseded by the May 12, 1998 MOA, which contained a choice of law provision
mandating application of United Kingdom law and providing for arbitration in
London.  The May 12, 1998 MOA did recite
that, upon the execution of a legally enforceable contract and upon acquiring
sufficient financing, Alenia would purchase fifty
percent equity in USRT.  However, any
obligations that might have arisen under the May 12, 1998 MOA were expressly conditioned on
the acquisition of credit facilities for $450 million and $100 million.  The parties do not dispute that this
financing was never obtained.  In this
context, we conclude that negotiation of a superseded MOA during a one-day
meeting in Houston and the potential obligation to purchase USRT stock that
never came to fruition are not sufficiently related to Reid’s claims to support
specific jurisdiction.[10]  See TeleVentures, Inc., 12 S.W.3d at 910.  

Reid’s Tort
Claims

            Reid also alleges that the Italian
Companies engaged in tortious conduct, in part, in Texas.  According to his pleadings, the Italian
Companies breached fiduciary duties to USRT by wrongfully removing USRT from
the alleged joint venture, converting and misappropriating the joint venture’s
assets, and usurping the joint venture’s business opportunities.  However, based on the record before us, the
only asset that Reid claims was converted and the only opportunity he claims
was usurped was USRT’s alleged rights to develop and
profit from the Plan as part of the alleged joint venture with Alenia.  Therefore,
though Reid is entitled to plead various torts, both his
breach-of-fiduciary-duty claim and his conversion claim are based on Alenia’s alleged wrongful removal of USRT from the alleged
joint venture.  The record shows that if Alenia continued the development and implementation of the
Plan without USRT, it would have done so in Italy and Russia.  Further, Alenia’s
December 20, 1999 letter to USRT — stating that the May 12, 1998 MOA was no
longer in effect — was sent to Siniscalchi in
Illinois.  After reviewing the record, we
find no evidence that this alleged wrongful removal occurred in Texas in such a
manner as to support specific jurisdiction. 
See BMC Software Belgium, N.V.,
83 S.W.3d at 796–97 (finding no evidence of tort committed in Texas). 

            Reid also asserts that Capra, Siniscalchi, and the Italian Companies conspired to
wrongfully remove USRT from the alleged joint venture.  However, the only evidence in the record that
arguably might relate to such a conspiracy is Reid’s description of a phone
call from Siniscalchi in which Siniscalchi
allegedly described discussions in Rome, between Viriglio of Alenia and Capra of
USRT.  Reid claims these discussions
occurred in Italy, not in Texas.  Even if Reid were in Texas when Siniscalchi telephoned him,[11] Siniscalchi’s act in making this phone call to Reid cannot
be counted as a contact of Alenia with Texas, because Siniscalchi was an officer of USRT, not an agent or
representative of Alenia.  See
National Indus. Sand Ass’n v. Gibson, 897 S.W.2d
769, 773 (Tex. 1995)
(stating alleged co-conspirator’s contacts with Texas cannot be
counted as contact of other alleged co-conspirators).  There is no evidence that any alleged
conspiratorial conduct by the Italian Companies occurred in Texas.[12]   

            Reid also claims that Alenia directed Reed, a Texas resident, to commit a tort in
Texas by asking him to approve and participate in an allegedly tortious proposal for USRT to transfer its rights in the
alleged joint venture to Alenia in exchange for
payments to Reed and others. However, there is no evidence that Alenia ever directed Reed to do this.  In any event, Reid testified in his affidavit
that Reed refused to be part of this alleged proposal, and Reid does not allege
or seek recovery for any damages based on any conduct by Reed in following Alenia’s alleged direction to participate in this
proposal.  

            Finally, as to Reid’s contention
that the Italian Companies tortiously interfered with
agreements between USRT and the Russian company Inspace,
there is no evidence in the record that any of the alleged interference took
place in Texas.  See BMC Software Belgium, N.V., 83 S.W.3d
at 796–97 (finding no evidence of tort committed in Texas).  In sum, the record contains no evidence that
the Italian Companies’ alleged tortious conduct
occurred in Texas.   

Brunt of
Alleged Injury under Reid’s Tort Theories

            Reid also asserts that, even if Alenia’s allegedly tortious
conduct occurred outside of Texas, the
exercise of specific jurisdiction is still appropriate because Alenia’s actions were expressly aimed at Texas and Alenia knew that the brunt of the alleged injury caused by
this conduct would be felt by USRT in Texas.  See
Calder v. Jones, 465 U.S. 783,
789–90, 104 S. Ct. 1482, 1487, 79 L. Ed. 2d 804 (1984);
Rittenmeyer v. Grauer,
104 S.W.3d 725, 735 (Tex.
App.—Dallas 2003, no pet.).  Even
assuming for the sake of argument that Alenia engaged
in tortious conduct and knew that this conduct would
harm USRT, Reid’s petition and affidavit both state that this conduct occurred
after USRT terminated Reid and Reed.  At
the time of the alleged tortious conduct, USRT was a Delaware
corporation owned by USRT Holdings, with no employees and no officers or
directors in Texas.  Therefore, we conclude Alenia
could not have expressly aimed its allegedly tortious
conduct at Texas or known
that the brunt of any injury from such conduct would be felt in Texas.

            Reid’s affidavit indicates that on May 19, 1999, an Alenia
representative (Viriglio) and Capra, while in Rome, discussed
the possibility of USRT transferring its rights in the alleged joint venture to
Alenia in exchange for a lump sum to be paid to
Capra, Siniscalchi, Reed, and Reid.  There is no evidence that any such transfer
ever occurred.  Instead, the evidence shows
Alenia sent a letter dated December 20, 1999, stating
the May 12, 1998 MOA was no longer in effect, and Reid alleges that in late
1999, the Italian Companies implemented the Plan without USRT’s
participation.  Therefore, this alleged
proposal never came to fruition and cannot be evidence that Alenia
committed a tort directed at Texas with the
knowledge that the brunt of the injury would be felt in Texas.  Accordingly, we find personal jurisdiction
cannot be based on this theory.  

            On this record, we conclude that the
Italian Companies’ very limited contacts with Texas relating
to the subject matter of this lawsuit are insufficient to support the exercise
of specific jurisdiction. 

B.        Did
the trial court properly conclude that it could exercise personal jurisdiction
over the Italian Companies based on general jurisdiction?

 

            General jurisdiction is a more
demanding minimum-contacts analysis, requiring a showing that the defendants
conducted substantial activities within the forum.  CSR,
Ltd. v. Link, 925 S.W.2d 591, 595 (Tex.
1996).  General jurisdiction does not
require that the plaintiff’s claims arise from or relate to the defendants’
activities purposefully directed to Texas.  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414,
104 S. Ct. 1868, 1872, 80 L. Ed. 2d 404
(1984).  General jurisdiction exists when
the defendant in question has “continuous and systematic general business
contacts” with the forum state.  Id., 466 U.S. at 416,
104 S. Ct. at 1873; American Type Culture Collection, Inc., 83 S.W.3d at 809.  General jurisdiction is based upon the
concept of a bargain between the nonresident defendant and the forum state. If
the defendant has established continuous and systematic general business contacts
with the state, it is deemed to have purposely availed itself of the
protections and benefits of the forum’s law, and thereby to have consented to
suit in the forum.  See Bearry v. Beech Aircraft Corp., 818
F.2d 370, 375 (5th Cir. 1987).  In
conducting a general-jurisdiction analysis, we are concerned with the quality
rather than the quantity of the contacts. 
See American Type Culture Collection, Inc., 83 S.W.3d at 809–10.  In assessing the quality of the contacts, we
do not view each contact in isolation; rather, we carefully investigate,
compile, sort, and analyze all contacts to determine if together they are
sufficient to support general jurisdiction. 
See id. at 809. 

            In addition to the contacts
identified in the specific-jurisdiction analysis, Reid asserts the following
contacts support the trial court’s implied finding of general
jurisdiction:  

!         Under Alenia’s
contract with the Italian Space Agency relating to the International Space
Station Project (“Space Station Project”), one Alenia
employee worked as a representative of the Italian Space Agency at an office in
the Johnson Space Center (the “Space Center”) in Texas from 1996 until 2000,
another Alenia employee worked in the same capacity
from November of 1999 to the present, and another from December of 2001 to the
present.

!         Since 1998, at least 117
employees of Alenia have traveled to the Space Center
in connection with the Space Station Project, averaging at least fifty
employees traveling per year, with an average of more than ten days in Texas
per employee.

!         Since
1998, at least sixty different employees of Alenia
have directed communications by telephone, facsimile, mail, or e-mail to
individuals located at the Space Center in connection with the
Space Station Project.

!         On at
least two occasions, Alenia sent a shipment from Italy to the Space Center.

!         The
Italian Companies had a contract with The Dee Howard Company, a Texas corporation and subsidiary
of Finmeccanica, that contains a Texas choice-of-law provision and
contemplates performance in Texas.

 

            Since 1996, under its contract with
the Italian Space Agency, Alenia has had at least one
and sometimes two employees at the Space Center in Texas.  Acting as representatives of the Italian
Space Agency, these Alenia employees provide
technical support and liaison services relating to the Space Station
Project.  The Space Station Project has
nothing to do with the dispute that is the basis of this suit.  Although the presence of at least one Alenia employee in Texas since 1996
has been continuous, our jurisdictional inquiry and analysis does not end
there.  We must determine if this contact
and the other contacts reflected in the record constitute “continuous and
systematic general business contacts” with Texas.  See Helicopteros Nacionales de
Colombia, S.A., 466 U.S. at 416,
104 S. Ct. at 1873; American Type Culture Collection, Inc., 83 S.W.3d at 809.  

            The record shows the one or two Alenia employees present at the Space Center were given
use of a telephone and an office at the Space Center.  The extension for this telephone was listed
in the phone directory for the Space Center under the
general heading “Italian Space Agency” and an individual entry under a
subheading “Alenia Representative.”  These employees were present at the Space Center pursuant
to a $300 million contract between Alenia and the
Italian Space Agency.  The record does
not reflect how much Alenia has been paid for
providing these employees on location at the Space Center; however, given the
nature and magnitude of the contract (to design and build components of the
Space Station Project), the compensation for providing these two employees is
likely a small part of the $300 million contract price.  Further, the record shows the Italian
Companies are organized and exist under Italian law, have principal places of
business in Italy, are not
qualified or authorized to conduct business in Texas, do not
maintain an inventory in Texas, and have
no sales representatives, distributors, brokers or wholesalers in Texas.  Moreover, nothing in the record suggests the
Italian Companies have undertaken any efforts to exploit Texas
markets.  They have no bank accounts or
listings in any public telephone directory in Texas.  They have not commenced suit in any Texas state
courts or filed claims in any Texas
proceedings.  They have not paid taxes or
franchise fees in Texas, do not
regularly advertise in Texas, and have
no authorized agents to accept service of process in Texas. 

            Reid argues that general
jurisdiction exists because Alenia has had an office
at the Space Center since
1996.  However, having an office in the
forum state does not require a finding of general jurisdiction.  See
Submersible Sys., Inc. v. Perforadora Central, S.A.
de C.V., 249 F.3d 413, 419 (5th Cir. 2001) (having a construction project
and maintaining an office with three employees in forum state did not satisfy
standard for general jurisdiction); Villar v. Crowley
Maritime Corp., 780 F. Supp. 1467, 1480–81 (S.D. Tex. 1992) (stating that
simply having an office in the forum state does not establish general
jurisdiction), aff’d 990 F.2d 1489 (5th Cir. 1993).   The significance of this contact depends on
the type and nature of office maintained. 
If a defendant maintains a permanent general business office through
which it solicits business in Texas, then this
factor tends to weigh strongly in favor of general jurisdiction.  See
James v. Illinois Cent. Railroad Co., 965 S.W.2d 594, 598 &
n.1  (Tex. App.—Houston [1st Dist.] 1998,
no pet.) (holding there was general jurisdiction where defendant solicited business
in Texas through
general business office).  There is
nothing to suggest Alenia maintained such an office
in Texas.  Rather, the record indicates that (1) Alenia was provided the use of an office, including a
telephone line, at the Space Center to allow
its employees to provide technical support and liaison services relating to the
Space Station Project; and (2) this office contained the logo for the Italian
Space Agency, not the logo for Alenia.  The record indicates that Alenia
does not utilize this office to promote or market its goods or services in Texas, or for
any purpose other than supporting the Space Station Project.  The nature of this office and its very
limited purpose and function significantly diminish the quality of the Italian
Companies’ contacts with Texas.[13]

            Further, the record shows that the
only reason Alenia sent employees to the Space Center is that
this location was chosen by the National Aeronautics and Space Administration
(“NASA”) as the location for these services. 
Alenia has contracts with the Italian Space
Administration, the European Space Administration, and a German space agency
relating to the Space Station Project. 
The record indicates that (1) these contracts require Alenia to perform various services in coordination with
NASA; (2) the contracts do not specifically require Alenia
to perform services in Texas; (3) NASA decided that some of these services
would be performed at the Space Center in Texas; and (4) before entering into
these contracts Alenia understood that some of its
services would be performed at the Space Center.  NASA, rather than the Italian Companies,
decided that some of Alenia’s services under the
contracts with three European entities would be performed at the Space Center.  We conclude that the nature of this
arrangement also significantly diminishes the quality of these contacts and
does not indicate that the Italian Companies purposefully directed their
business activity at Texas.  See
American Type Culture Collection, Inc., 83 S.W.3d at 809 (discounting
quality of contacts regarding defendant’s attendance at five conferences in
Texas because defendant did not select the location of the conferences);  Reyes
v. Marine Drilling Cos., Inc., 944 S.W.2d 401, 402–04 (Tex. App.—Houston
[14th Dist.] 1997, no writ) (discounting quality of contacts where defendant
sent representatives to Texas at least 204 times to perform quality-assurance
inspections, because these inspections were necessitated by defendant’s
contractual obligations with the United States government); Conner v. ContiCarriers
and Terminals, Inc., 944 S.W.2d 405, 417–18 (Tex. App.—Houston [14th Dist.]
1997, no writ) (plurality op.) (discounting quality of contacts in which
defendant’s customer, not defendant, chose Texas destination for transportation
services); Asarco, Inc v. Glenara, Ltd., 912 F.2d 784, 787 (5th Cir. 1990)
(finding no jurisdiction and discounting quality of contacts regarding 20 port
calls of vessel in forum state because company that managed vessels did not
choose where vessels would make port);
Conner v. Bouchard Transp. Co., Inc., 1994 A.M.C.
258, 1993 WL 388274, at *1–*3 (E.D. Pa. 1993) (finding no general jurisdiction
despite over 100 port calls in forum state by defendant-owner’s vessel, because
all visits were prompted by chartering agreement in which charterer
determined destination of defendant’s vessels); American Overseas Marine Corp. v. Patterson, 632 So.2d 1124,
1126–30 (Fla. App. 1994) (finding no jurisdiction and discounting quality of
contacts relating to port calls in forum state because they were not by the
choice of defendants but at the direction of the United States military under
contracts with the United States).

            The record also contains a contract
between Alenia and The Dee Howard Company, a Texas corporation
owned by a subsidiary of Finmeccanica.  Though this contract contains a Texas
choice-of-law provision, it has no forum-selection provision.  Reid asserts that by agreeing to this Texas
choice-of-law provision, Alenia availed itself of the
benefits and protections of Texas law and
consented to being sued in Texas.  We disagree. 
By agreeing to a Texas
choice-of-law provision, a party does not avail itself of any protection from Texas courts or
voluntarily submit to personal jurisdiction in Texas courts,
absent an express understanding to that effect. 
See Moni
Pulo Ltd. v. Trutec Oil and
Gas, Inc., —S.W.3d—, —, 2003 WL ________, at *2 & n.15 (Tex. App.—Houston [14th
Dist.] Dec. 4, 2003, no pet.
h.).  There is no evidence in the record
of an express understanding that Alenia submitted to
the jurisdiction of Texas courts by
executing the contract with The Dee Howard Company.  Moreover, the significance of this contract
and its Texas
choice-of-law provision is diminished by the fact that the contract is contingent
upon Alenia seconding employees to The Dee Howard
Company to perform the services anticipated to be performed under the
contract.  The record contains no
evidence that Alenia ever seconded employees to The
Dee Howard Company or that any services were ever performed under this
contract.  In this context, and from a
qualitative standpoint, we do not view this contract and its choice-of-law
provision as a significant contact in the general-jurisdiction analysis.

            In Reyes v. Marine Drilling Cos., Inc., this court found no general
jurisdiction despite the following contacts of the defendant with Texas:

(1)       The defendant had purchased goods in excess of $183 million in
Texas from at least 471 persons and/or companies in Texas.  

(2)       The defendant had purchased over $63.3 million in products from
a company in Houston, Texas and had entered into
contracts with that company for equipment purchases and repairs.  

(3)       The defendant, as purchaser, had entered into 303 contracts
and/or agreements with a company in Conroe, Texas.  

(4)       The defendant advertised for employees in five periodicals in Texas.

(5)       The defendant had sold $851,511.88 worth of scrap metal to Texas companies, all of which was
delivered in Mississippi.  

(6)       The defendant had sent representatives to Texas on at least 204 occasions
to perform quality-assurance inspections necessitated by the defendant’s
obligations under contracts with the United States.

 




 








            Despite the large quantity of
contacts in Reyes, this court
concluded there was no personal jurisdiction under a general-jurisdiction
analysis because the record did not show a general business presence in Texas.  See id.
at 404–05.  The defendant did not
have a business office in Texas and did
not distribute or market its products in Texas.  See id.  Similarly, in this case, there is no evidence
the Italian Companies advertised or promoted their goods or services in Texas,
solicited business in Texas, sold their goods or services to a Texas entity,
established a general business office or general business presence in Texas, or
targeted Texas markets.  

            After carefully analyzing the nature
and quality of the Italian Companies’ contacts with Texas, we find
no continuous and systematic general business contacts with Texas such that
these companies can be deemed to have consented to being sued in Texas.  See Helicopteros Nacionales de
Colombia, S.A., 466 U.S. at 416, 104 S. Ct. at 1873 (holding there was no
general jurisdiction even though defendant sent its chief executive officer to
Texas for a contract-negotiating session, accepted into its bank account checks
drawn on a bank in Texas, purchased $4 million of goods and equipment from a
company in Texas, and sent employees to Texas for training and technical
consultation);  Submersible Sys., Inc., 249 F.3d at 419–21
(holding that having a construction project in forum state and maintaining an
office with three employees in forum state did not satisfy standard for general
jurisdiction); Strick Corp. v. A.J.F. Warehouse Distribs., Inc., 532 F. Supp. 951, 956–60 (E.D. Pa.
1982) (holding there was no general jurisdiction despite defendant’s office in
forum over four-year period because record did not show that defendant targeted
the forum-state market or made a substantial number of sales in the forum); CSR, Ltd., 925 S.W.2d at 595 (stating
there must be an indication that defendant intended to serve the Texas market
before personal jurisdiction may be found); 
Michel v. Rocket Eng’g Corp., 45 S.W.3d 658, 671–82 (Tex. App.—Fort
Worth 2001, no pet.) (holding record did not support general jurisdiction
because it did not show that defendant created a general business presence in
Texas through continuing and systematic activities); Reyes, 944 S.W.2d at 402–04 (holding there was no general
jurisdiction despite defendant’s purchase of large amounts of supplies from
Texas companies and sending representatives to Texas at least 204 times to
perform quality-assurance inspections). 
Therefore, we conclude a Texas court may
not exercise personal jurisdiction over the Italian Companies under a
general-jurisdiction theory.

C.        Did
the trial court properly conclude that exercising personal jurisdiction over
the Italian Companies would comport with traditional notions of fair play and
substantial justice?

 

            In addition to sufficient minimum
contacts with Texas, federal
due process requires that the exercise of personal jurisdiction comport with
traditional notions of fair play and substantial justice.  See
Guardian Royal Exch. Assur., Ltd., 815 S.W.2d at
228.  In deciding this issue, the court
should consider the following factors: 

!         the
burden on the defendants; 

!         the
interests of the forum state in adjudicating the dispute; 

!         the
plaintiff’s interest in obtaining convenient and effective relief; 

!         the
interstate judicial system’s interest in obtaining the most efficient
resolution of controversies; and 

!         the
shared interest of the several states in furthering fundamental substantive
social policies. 

 

Id.  When, as here, the defendants are residents
of another nation, the court should also consider:

!         the
unique burdens placed on the defendant who must defend itself in a foreign
legal system;

!         the
procedural and substantive policies of other nations whose interests are
affected by the assertion of jurisdiction by a state court; and

!         the United States government’s interest in
its foreign-relations policies. 

 

Id. at 229. 

            In considering the burden the
Italian Companies would face were they forced to defend in Texas, we note that
the record indicates that all official business records of USRT relating to the
Plan are in Houston, Texas, and that potential witnesses Aksamentov,
Reed, and Larry Bell reside in Texas. 
However, Reid, the plaintiff, resides in Canada.  Other potential witnesses also reside outside
of Texas — Siniscalchi (residing in Illinois), Capra
(residing in Italy), current
and former Alenia employees and Finmeccanica
employees (residing in Italy), and
third-party witnesses from Inspace and RSCC (residing
in Russia).  Though Alenia
employees have traveled to Texas under
contracts that Alenia has with the Italian Space
Agency, the European Space Agency, and a German space agency, the record shows
that, other than a suit filed by the former shareholders of USRT, the Italian
Companies have never been sued in Texas.  Allowing the suit to proceed in Texas would be
expensive and burdensome for the Italian Companies and it would force them to
defend against Reid’s claims in a foreign legal system.  See id.
at 229. 

            Most significantly, we find that the
interests of Texas in
adjudicating this dispute are minimal. 
Reid, a Canadian resident and citizen, is asserting a double derivative
action against two Italian companies, which, if successful, would result in a
judgment in favor of USRT Holdings, a Delaware holding company
owned ninety percent by an Italian resident and ten percent by a Canadian
resident (Reid).  The claim upon which
USRT Holdings would recover at the request of Reid belongs to USRT.  Although there is evidence to support a
finding that USRT’s principal place of business was
in Texas through
August of 1999, there is no evidence that its principal place of business has
been in Texas since that
time.  Because this dispute does not
involve any Texas entity and
cannot result in a judgment in favor of any Texas entity, we
conclude that Texas’s minimal
interest in this dispute strongly militates against the assertion of
jurisdiction in this case. See id. at
23–33 (holding exercise of jurisdiction would offend traditional notions of
fair play and substantial justice where Texas did not have a compelling
interest in providing a forum for resolution of claims in which plaintiffs
sought reimbursement for a non-Texas insurer, even though two of the plaintiffs
were Texas corporations with principal places of business in Texas and even
though the facts of the case involved a deceased Texas employee); Bearry, 818 F.2d
at 377 (holding assertion of jurisdiction would be unreasonable primarily
because suit implicated virtually no distinct interest of Texas).

            Though the parties have thoroughly
briefed most other aspects of the jurisdictional analysis, they have provided
little assistance in assessing the procedural and substantive policies of other
nations whose interests would be affected by a Texas court’s
assertion of jurisdiction.  We note,
however, that Reid seeks a multi-million-dollar judgment against Alenia, an Italian company, and its parent, Finmeccanica, an Italian company in which Italian
government entities own a 34 percent interest. 
Further, Reid seeks to recover based on an alleged plan that
contemplated obtaining rights from the Russian government to certain orbital
slots for communications satellites, manufactured by Alenia
in Italy with
financing from the Italian government, and placed in geosynchronous orbit over Russia by means
of launches from stations in Russia.  These facts raise important concerns
regarding the substantive policies of Italy and Russia and the
impact that the exercise of jurisdiction might have on the United
 States government’s foreign-relations
policies vis-a-vis
these countries. 

            As for Reid’s interest in obtaining
convenient and effective relief, we note that Reid testified that litigating
this matter in Italy would
place a tremendous financial burden on him. 
Certainly litigating this dispute in Texas may be
more cost-effective and convenient for Reid; however, it is not clear that his
interest in effective relief will be better served by a Texas
judgment.  The United
 States is not party to any multilateral
convention regarding recognition of foreign judgments.  See
Alan Reed, A New Model of Jurisdictional
Propriety For Anglo-American Foreign Judgment Recognition and Enforcement:
Something Old, Something Borrowed, Something New? 25 Loy. L.A. Int’l & Comp. L. Rev.
243, 245 n.1 (2002).  To obtain effective
relief against the assets of the Italian Companies in Italy, if he 

 class=Section9>

becomes
entitled to it, Reid, at some point, will have to convince the appropriate decisionmakers in the Italian judicial system that, under
Italian law, he is entitled to enforce a valid Texas judgment against the
Italian Companies, despite the absence of a bilateral treaty on this subject
between Italy and the United States. 
Thus, although it may be less expensive and more convenient for Reid to
litigate in Texas, the
relief he can obtain here against the Italian Companies may not be more
effective.  See Insurance Co. of N. Am.
v. Marina Salina Cruz, 649 F.2d 1266, 1273 (9th Cir. 1981) (stating that
potential difficulties enforcing American judgment in foreign country may be
considered in weighing the plaintiff’s interest in obtaining convenient and
effective relief); In re Baldwin-United
Corp., 607 F. Supp. 1312, 1330 (S.D.N.Y. 1985) (stating, in context of
class-action settlement, that effective relief is essentially a judgment that
is collectible and practical). 
Therefore, we find this factor does not weigh strongly in favor of the
reasonableness of a Texas court
exercising personal jurisdiction over the Italian Companies. 

            After considering all applicable
factors and interests, we conclude that the exercise of personal jurisdiction
by a Texas court over
the Italian Companies would be unreasonable and would offend traditional
notions of fair play and substantial justice.

                                                             IV.  Conclusion

            In
grappling with these difficult jurisdictional issues, the trial court observed
that this case presented “a tough call,” but ultimately found the Italian
Companies subject to jurisdiction in Texas and denied
their special appearances.  We agree with
the trial court’s characterization, but not with its ruling.  We find no basis for personal
jurisdiction.  Reid’s claims do not arise
from or relate to the Italian Companies’ purposeful contacts with Texas and thus
provide no basis for specific jurisdiction. 
Moreover, the record does not show that the Italian Companies have
established continuous and systematic general business contacts with Texas sufficient
to support general jurisdiction. 
Furthermore, the exercise of personal jurisdiction over them would be
unreasonable and would offend traditional notions of fair play and substantial
justice.  

            Having found that the Italian
Companies are not subject to the jurisdiction of the trial court, we sustain
the two issues they have asserted on appeal, reverse the trial court’s order
denying their special appearances, and remand this case to the trial court with
instructions to dismiss the claims against the Italian Companies for lack of
personal jurisdiction. 

 

 

                                                                                    

                                                                        /s/        Kem Thompson Frost

                                                                                    Justice

 

Judgment
rendered and Majority Opinion filed December
 23, 2003.

 

Panel consists of Justices Edelman, Frost, and
Seymore.  (Edelman, J., dissents without
filing an opinion). 

 

 











            [1]  We refer to the two corporate appellants in
this action as the “Italian Companies.” 
We note, however, that during the time period giving rise to Reid’s
claims, Alenia Spazio, S.p.A., which we refer to as “Alenia,”
was a division of Finmeccanica, S.p.A.  Finmeccanica’s
ownership structure changed in 1999, and again in 2000, but its owners have
been, in varying degrees, the Italian Treasury Ministry, IRI (a company wholly
owned by the Italian Treasury Ministry), and partial public ownership by
listing of shares on the Milan stock exchange. 
Alenia became Alenia
Spazio, S.p.A. on April 1, 2000, and is wholly owned by Finmeccanica.





            [2]  Under its own terms, the May 15, 1998 MOA
expired on July 14, 1998, because the parties had
not entered into any binding final agreement for implementation of the first
phase of the Plan. 





            [3]   Reid asserts the following claims against
the Italian Companies: (1) breach of an alleged joint-venture agreement on
behalf of USRT; (2) breach of an alleged fiduciary duty arising out of the
alleged joint-venture agreement with USRT; (4) conversion of USRT assets,
including the right to participate in and receive profits from the Plan; and
(5) tortious interference with an alleged contract
between USRT and Inspace.





            [4]  Reid claims the Italian Companies have waived
any legal or factual sufficiency challenges to the trial court’s implied findings
of fact because their briefing contains no issues or argument  explicitly asserting that these findings are
not supported by legally or factually sufficient evidence. Although the Italian
Companies have not explicitly challenged the trial court’s implied findings of
fact, their briefing does assert that USRT’s
principal place of business was not in Texas, and they cite evidence in
the record in support of this argument. 
The Italian Companies also argue that they have not been involved in any
transaction in Texas and that the record does
not show that the Italian Companies have sufficient contacts with Texas to satisfy specific or
general jurisdiction.  We conclude that a
challenge to the trial court’s implied findings in favor of jurisdiction is a
subsidiary question fairly included in the Italian Companies’ issues and that
the Italian Companies have sufficiently briefed this challenge.  See
Tex. R. Civ.
P. 38.1 (e), (h), 38.9; Stephenson
v. LeBoeuf, 16 S.W.3d 829, 843–44 (Tex. App.—Houston [14th Dist.] 2000, pet.
denied).





            [5]  The Italian Companies assert that Reid did
not allege any act by the Italian Companies in Texas and that, therefore, they
only had to prove that they are nonresidents of Texas to be entitled to
dismissal.  See Siskind v. Villa Found. for Educ., Inc., 642 S.W.2d 434, 438 (Tex. 1982).  After reviewing Reid’s original and
supplemental petitions, we conclude Reid satisfied this pleading requirement.





            [6]  Virgilio testified
at his deposition that he did meet with a representative of Inspace
(Topalov) and Capra on May
 19, 1999, but that Viriglio did not participate in
any conversations about transferring anything away from USRT.  However, for purposes of this appeal, we
presume for the sake of argument that the discussion occurred as stated in
Reid’s affidavit.





            [7]  Reid’s affidavit states that USRT terminated
Reed in August of 1999, and that USRT terminated Reid from his position as
manager and board member in August of 1999. 
However, Reid’s affidavit states USRT did not terminate Reid from his
position as chief financial officer until September 8,
 1999.  





            [8]  In conducting the jurisdictional analysis, we
do not adjudicate the merits of Reid’s claims, and it should be noted that, in
a deposition taken in September of 2002, Viriglio
denied that Alenia had taken any active role in
implementing the Plan. 





            [9]  The record shows that after Reed’s departure,
Reid, a Canadian citizen, continued as chief financial officer until September 8, 1999, when he ceased to be an officer.  The others continuing to serve as officers
were Siniscalchi, an alleged Illinois resident, and Capra, a
citizen and resident of Italy.  





            [10]  To the extent that Reid alleges tortious conduct based on the same actions alleged under
the breach-of-contract theory, the same analysis applies.





            [11]  The record does not reflect where Reid or Siniscalchi were located during this phone call.





            [12]  Reid asserts that General Elec. Co. v. Brown & Ross Int’l Distributors, Inc.
stands for the proposition that a defendant who participates in a conspiracy
known to impact Texas has satisfied the
requirements for specific jurisdiction.  See 804 S.W.2d 527, 533 (Tex.
App.—Houston [1st Dist.] 1990, writ denied). 
We disagree.  Although the
analysis is difficult because the Brown
& Ross court never identifies what tort claims the plaintiff in that
case was asserting, the court did not state that mere participation in a
conspiracy known to  impact Texas was sufficient.  See id.
 Rather, the Brown & Ross court concluded that there was jurisdiction
because the record showed that the defendant in question knew his conduct would affect Texas customers.  See id.  This is consistent with the Calder v. Jones line of cases discussed
in the next section. See Calder v. Jones,
465 U.S. 783, 789–90, 104 S. Ct. 1482, 1487, 79 L. Ed. 2d
804 (1984).





            [13]  Reid asserts that Perkins v. Benguet Consolidated Mining Co.
shows that a company need not target the forum market for there to be general
jurisdiction. See 342 U.S. 437, 72 S. Ct. 413, 96 L. Ed. 485 (1952).
However, the Perkins case involved
unusual facts.  In Perkins, the defendant company’s regular business operations in the
Philippines were completely halted
during the occupation of the Philippines by Japan, and the company’s
principal stockholder effectively transferred the company’s main office to Ohio during the Japanese
occupation of the Philippines.  See id.,
342 U.S. at 447–49, 72 S. Ct. at 419–20.  Perkins
may indicate that targeting the forum-state market is not necessary if the
defendant’s regular business operations are halted and the center of corporate
decision-making is transferred to the forum state, but these are not the facts
before us in this case. See American Type
Culture Collection, Inc., 83 S.W.3d at 809–10 (distinguishing Perkins).